Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Steven Henesy, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY
COMPANY,

Docket No.:_____ (      )

Plaintiffs,

-against-

**Plaintiff Demands a Trial by Jury**

OMAR F. AHMED, M.D.
PHYLLIS GELB, M.D.
ENS MEDICAL, P.C.
QUEENS MEDICAL DIAGNOSTIC, P.C.,
EAST COAST MEDICAL CARE, P.C.,
GARDEN MEDICAL CARE, P.C.,
TOWN MEDICAL CARE, P.C.,
ATLANTIC MEDICAL CARE, P.C., and
JOHN DOE DEFENDANTS "1"-"10,"

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against defendants Omar F. Ahmed, M.D., Phyllis Gelb,

M.D., ENS Medical, P.C., Queens Medical Diagnostic, P.C., East Coast Medical Care, P.C., Garden

Medical Care, P.C., Town Medical Care, P.C., Atlantic Medical Care, P.C., and John Doe Defendants "1"-"10" (collectively, the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $2,293,000.00 that Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, hundreds of fraudulent no-fault insurance charges relating to medically unnecessary, experimental, excessive, illusory, and otherwise unreimbursable healthcare services, including bogus patient examinations, videonystagmus ("VNG") testing, transcranial doppler tests ("TDT"), extracorporeal shockwave therapy ("ESWT"), nerve conduction velocity ("NCV") testing, and electromyography ("EMG") studies (collectively, the "Fraudulent Services"), which allegedly were provided to New York automobile accident victims insured by GEICO ("Insureds").

2.      Defendant Omar F. Ahmed, M.D. ("Ahmed") is a physician licensed to practice in New York who purports to own a series of medical professional corporations, including Defendants ENS Medical, P.C., Queens Medical Diagnostic, P.C., East Coast Medical Care, P.C., Garden Medical Care, P.C., Town Medical Care, P.C., and Atlantic Medical Care, P.C. (collectively, the "PC Defendants"), that have billed GEICO and other New York automobile insurers for the Fraudulent Services as part of scheme to exploit New York's no-fault insurance system. The PC Defendants purport to be legitimate professional corporations, but they operate on a transient basis, have no patients of their own, and provide no legitimate or medically necessary services.

3.      Defendant Phyllis Gelb, M.D. ("Gelb") is a physician licensed to practice in New York who also purports to own Town Medical, P.C. and is listed on virtually all of Town Medical, P.C.'s billing as the "Treating Provider." However, Gelb is nothing more than a nominal owner, and rarely, if ever, personally treated any patients.  In reality, Gelb served to conceal Ahmed's true

ownership and control of Town Medical and the provision of the Fraudulent Services, which were virtually always performed by independent contractors—specifically, unsupervised physician assistants—in violation of New York law

4.      Defendants, including John Doe Defendants "1"-"10," perpetrated the fraudulent scheme using illegal referral and kickback arrangements facilitated through, among other things, payments to shell companies, that permitted the PC Defendants to access a steady stream of automobile accident victims, fraudulently bill GEICO for millions of dollars of Fraudulent Services, and exploit the patients for financial gain without regard to genuine patient care.

5.      GEICO seeks to recover the monies stolen from it and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $5,609,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of the PC Defendants because:

(i)      the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds;

(ii)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iii)    the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of laypersons not licensed to render healthcare services and through the use of illegal kickback arrangements;

(iv)    in many cases, the Fraudulent Services – to the extent provided at all – were provided by independent contractors rather than by employees of the PC Defendants; and

(v)     with respect to East Coast Medical Care, P.C., Queens Medical Diagnostic, P.C., Garden Medical Care, P.C., and Town Medical, P.C., specifically, the Fraudulent Services were performed in violation of material licensing laws, as many of their respective Fraudulent Services were performed by unsupervised physician assistants, and therefore were unreimbursable.

6.      The Defendants fall into the following categories:

(i)     Defendant Ahmed is a physician licensed to practice medicine in the State of New York, who purports to own the PC Defendants, and who purported to perform some of the Fraudulent Services.

(ii)    Defendants ENS Medical, P.C. ("ENS Medical"), Queens Medical Diagnostic, P.C. ("Queens Medical"), East Coast Medical Care, P.C. ("ECMC"), Garden Medical Care, P.C. ("Garden Medical"), Town Medical Care, P.C. ("Town Medical"), and Atlantic Medical Care, P.C. ("Atlantic Medical") are New York medical professional corporations, through which the Fraudulent Services purportedly were performed and billed to New York automobile insurance companies, including GEICO.

(iii)   Defendant Phyllis Gelb, M.D. is a physician licensed to practice medicine in the State of New York, who purportedly owns Town Medical and purportedly performed virtually all of the Fraudulent Services rendered through Town Medical.

(iv)    John Doe Defendants "1"-"10" ("John Doe Defendants") are individuals and/or entities who participated in the fraudulent scheme perpetrated against GEICO by, among other things, assisting with the operation of the PC Defendants and the provision of medically unnecessary services, "brokering" or "controlling" access to patients in exchange for illegal kickback payments, and/or spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

7.      As discussed herein, the Defendants at all relevant times have known that: (i) the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (ii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; (iii) the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons and through the use of illegal kickback arrangements; and (iv) in many cases, the Fraudulent Services – to the extent provided at all – were provided by independent contractors, rather than by Ahmed, Gelb, or employees of the PC Defendants.  In addition, Defendants knew that Queens Medical, ECMC, Garden Medical, Town Medical, and

Atlantic Medical rendered many of their respective Fraudulent Services through unsupervised physician assistants, in violation of material licensing laws.

8. As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they billed to GEICO.

9. The charts annexed hereto as Exhibits "1" through "6" set forth a representative sample of the fraudulent claims that have been identified to-date that Defendants submitted, or caused to be submitted, to GEICO.

10. The Defendants' fraudulent scheme began as early as 2016 and has continued uninterrupted through the present day, as the PC Defendants continue to seek collection on pending charges for the Fraudulent Services.

11. As a result of Defendants' fraudulent scheme, GEICO has incurred damages of more than $2,293,000.00.

## THE PARTIES

### I. Plaintiffs

12. Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II. Defendants

13. Defendant Ahmed resides in and is a citizen of New York.  Ahmed was licensed to practice medicine in New York on June 15, 2006 and is the owner of the PC Defendants.  Each of the PC Defendants has been used by Ahmed, with the help of John Doe Defendants "1"-"10," to submit fraudulent billing to GEICO.

14.     Defendant Gelb resides in and is a citizen of New York.  Gelb was licensed to practice medicine in New York on February 23, 1996.  Gelb is purportedly a nominal owner of Town Medical and is listed on virtually all of Town Medical's billing as the "Treating Provider" who rendered the Fraudulent Services.

15.     Defendant Ahmed is no stranger to no-fault insurance fraud schemes. In fact, Ahmed was named as a defendant in a no-fault insurance fraud lawsuit alleging, among other things, that Ahmed paid illegal kickbacks in exchange for patient referrals and provided healthcare services pursuant to a pre-determined treatment protocol. See Gov't Emples. Ins. Co., et al., v. Northern Medical Care, P.C., et al., 20-cv-01214 (E.D.N.Y.).

16.     Defendant ENS Medical is a New York professional corporation incorporated on or about April 21, 2017, with its principal place of business in New York.

17.     Defendant Queens Medical is a New York professional corporation incorporated on or about July 7, 2016, with its principal place of business in New York.

18.     Defendant ECMC is a New York professional corporation incorporated on or about January 3, 2020, with its principal place of business in New York.

19.     Defendant Garden Medical is a New York professional corporation incorporated on or about April 12, 2021, with its principal place of business in New York.

20.     Defendant Town Medical is a New York professional corporation incorporated on or about August 13, 2020, with its principal place of business in New York.

21.     Defendant Atlantic Medical is a New York professional corporation incorporated on April 17, 2017, with its principal place of business in New York.

22.     Upon information and belief, John Doe Defendants reside in and are citizens of New York. John Doe Defendants are individuals and entities, presently not identifiable, who

knowingly participated in the fraudulent scheme by, among other things, assisting with the operation of the PC Defendants and the provision of medically unnecessary services, "brokering" or "controlling" access to patients in exchange for illegal kickback payments, and/or spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

24.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

25.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

26.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

27.     GEICO underwrites automobile insurance in New York.

## I.     An Overview of the Pertinent Law Governing No-Fault Reimbursement

28.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.

Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

29.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

30.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

31.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

32.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

33.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York …. (Emphasis added).

34.     In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

35.     Unlicensed non-physicians may <u>not</u>: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

36.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals.  <u>See, e.g.</u>, New York Education Law §§ 6509-a; 6530(18); and 6531.

37.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. <u>See, e.g.</u>, New York Education Law § 6512, § 6530(11), and (19).

38.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments, or allows unlicensed laypersons to share in the fees for the professional services.

39.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that health care providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and/or local laws.

40.     In <u>Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.</u>, 33 N.Y.3d 389, 393 (2019), the New York Court of Appeals reiterated that only licensed physicians may practice

medicine in New York because of the concern that unlicensed individuals are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

41.     Pursuant to the No-Fault Laws, only health care providers in possession of a <u>direct</u> assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

42.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

43.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

44.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

45.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     **Defendants' Fraudulent Scheme**

### A.     **Overview of the Scheme**

46.     Beginning in 2016, and continuing through the present day, Ahmed and the PC Defendants, with the aid of the John Doe Defendants, masterminded and implemented a complex fraudulent scheme in which the PC Defendants were used to bill GEICO and other New York automobile insurers millions of dollars for medically unnecessary, experimental, excessive, illusory, and/or otherwise unreimbursable healthcare services.

47.     The Fraudulent Services billed under the names of the PC Defendants were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, and were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

48.     Ahmed rarely, if ever, personally performed any services on behalf the PC Defendants. Instead, the vast majority, if not all, of the Fraudulent Services were performed by independent contractors, in violation of the No-Fault regulations and New York law.

49.     Ahmed did not operate the PC Defendants at any single, fixed location.

50.     Ahmed, instead, operated the PC Defendants on an itinerant basis from various "No-Fault" medical clinics, primarily located in Brooklyn, Queens, and Bronx.

51.     As a result of illegal kickback and referral arrangements, the PC Defendants, over a five-year span, accessed patients and allegedly provided Fraudulent Services from a total of at least 67 different No-Fault medical clinic locations, where the PC Defendants received steady volumes of patients through no legitimate efforts of their own, including at the following clinics (collectively, the "Clinics"):

- 102-34 Atlantic Avenue, Ozone Park;
- 1050 Old Nichols Road, Islandia;
- 105-10 Flatlands Avenue, Brooklyn;
- 1065 Old Country Road, Westbury;
- 107-48 Guy R Brewer Boulevard, Jamaica;
- 11 East Hawthorn Avenue, Valley Stream;
- 1122 Coney Island Avenue, Brooklyn;
- 135 Eastern Parkway, Brooklyn;
- 14 Bruckner Boulevard, Bronx;
- 149-36 Northern Boulevard, Flushing;
- 15-30 Bedford Avenue, Brooklyn;
- 164-10 Crocheron Avenue, Flushing;
- 1647 Macombs Road, Bronx;
- 1655 Richmond Avenue, Staten Island;
- 1767 Southern Boulevard, Bronx;
- 179 Great Neck Road, West Babylon;
- 1799 Brentwood Road, Brentwood;
- 1800A New York Avenue, Huntington Station;
- 1894 Eastchester Road, Bronx;
- 1975 Linden Boulevard, Elmont;
- 204-12 Hillside Avenue, Hollis;
- 21 Washington Avenue, Brentwood;
- 214-29 Jamaica Avenue, Queens Village;
- 2148 Flatbush Avenue, Brooklyn;
- 221-05 Jamaica Avenue, Queens Village;
- 2273 65th Street, Brooklyn;
- 2426 Eastchester Road, Bronx;
- 2488 Grand Concourse, Bronx;
- 2598 Third Avenue, Bronx;
- 2799 Route 112, Medford;
- 300 Hempstead Turnpike, West Hempstead;

- 3041 Avenue U, Brooklyn;
- 3060 East Tremont Avenue, Bronx;
- 3250 Westchester Avenue, Bronx;
- 33-06 88th Street, Jackson Heights;
- 332 East 149th Street, Bronx;
- 3432 East Tremont Avenue, Bronx;
- 360A West Merrick Road, Valley Stream;
- 37-03 92nd Street, Jackson Heights;
- 37 Smith Street, Freeport;
- 4011 Warren Street, Elmhurst;
- 4014A Boston Road, Bronx;
- 409 Rockaway Avenue, Brooklyn;
- 4226A Third Avenue, Bronx;
- 4250 White Plains Road, Bronx;
- 4626 White Plains Road, Bronx;
- 488 Lafayette Avenue, Brooklyn;
- 507 Westchester Avenue, Bronx;
- 513 Church Avenue, Brooklyn;
- 535 Broadhollow Road, Melville;
- 5414 Avenue N, Brooklyn;
- 560 Prospect Avenue, Bronx;
- 60-40 82nd Street, Middle Village;
- 607 Westchester Avenue, Bronx;
- 615 Seneca Avenue, Ridgewood;
- 62-69 99th Street, Rego Park;
- 632 Utica Avenue, Brooklyn;
- 69-37 Myrtle Avenue, Glendale;
- 788 Southern Boulevard, Bronx;
- 79-45 Metropolitan Avenue, Middle Village;
- 820 Hempstead Turnpike, Franklin Square;
- 82-25 Queens Boulevard, Woodside;
- 89-25 130th Street, Richmond Hill;
- 900 East Tremont Avenue, Bronx;
- 900 Route 109, Lindenhurst;
- 90-16 Sutphin Boulevard, Jamaica;
- 90-46 Corona Avenue, Elmhurst; and
- 94-13 Flatlands Avenue, Brooklyn.

52.     In keeping with the fact that Ahmed sought to operate the PC Defendants in a manner that maximized financial gain while concealing the true extent of the fraudulent scheme, there was little overlap among the PC Defendants' operation at the various Clinics. Specifically,

47 of the 67 Clinics were not shared among the PC Defendants—i.e., Ahmed never operated more than one of the PC Defendants from 47 of the Clinics. The remaining Clinics were never shared by more than three of the PC Defendants.

53.     Ahmed's decision to avoid overlap among treatment locations was intentional because—by operating the PC Defendants from different locations, spreading the Fraudulent Services among different PC Defendants, and billing under different tax identification numbers—doing so enabled Ahmed to maximize the PC Defendants' billing opportunities and increase the PC Defendants' chances of receiving insurance payments for the Fraudulent Services, all while making it more difficult for insurers, including GEICO, to discover the nature and extent of the fraudulent scheme.

54.     Ahmed and the PC Defendants, in order to obtain access to the Clinics' patient base (i.e., Insureds), entered into illegal kickback and referral arrangements with unlicensed laypersons and/or healthcare professionals, including John Doe Defendants, who controlled access to the patients at the Clinics and, in exchange for kickback payments, provided access to the patients who were treated, or purported to be treated, at the Clinics.

55.     Ahmed and the PC Defendants thereafter subjected Insureds at the Clinics to various medically unnecessary and illusory healthcare services, including bogus examinations and consultations where the supposed "results" were never incorporated into any of the Insureds' treatment plans or otherwise acted upon in any way, purported diagnostic tests with no clinical basis and often with results that were medically impossible, and purported therapy services that were experimental and investigational, among other things, all solely to maximize profits without regard to genuine patient care.

56.     In order to carry out the fraudulent scheme, Ahmed and the PC Defendants took many steps to conceal its true nature and extent. For example, the bills submitted by ECMC, Queens Medical, and Garden Medical typically represented that Ahmed was the treating provider when, in fact, many of the Fraudulent Services were performed by unsupervised physician assistants.

57.     In keeping with the fact that Defendants sought to conceal the nature and extent of the fraudulent scheme, the bills submitted by Town Medical represented that Gelb was both the treating provider and the owner of Town Medical. In reality, Town Medical's services were virtually always rendered by independent contractors—unsupervised physician assistants—and Town Medical was, and always has been, owned, controlled, and operated by Ahmed.

58.     Specifically, Ahmed is listed as the incorporator on Town Medical's certificate of incorporation and is registered as Town Medical's owner with the New York State Education Department's Office of the Professions.

59.     In keeping with the fact that Ahmed owned, controlled, and operated Town Medical, an individual associated with one of the Clinics provided GEICO with Cristina Prince's email address as the contact information for Town Medical.  During the EUO of ENS Medical, Ahmed identified Cristina Prince as his administrative assistant.

60.     Upon information and belief, in order to conceal his association with Town Medical, Ahmed enlisted Gelb to serve as nominal owner so that Town Medical could represent on its billing to no-fault insurance carriers, including GEICO, that Gelb was the owner.

61.     Upon information and belief, Gelb allowed Ahmed to use her medical license and to list her as the owner on Town Medical's billing in exchange for financial compensation, even

though Gelb knew that she would not have any beneficial ownership or control over Town Medical – and knew that Town Medical was going to be used to submit fraudulent billing to insurers.

**B.      The Illegal Kickback and Referral Relationships at the Clinics**

62.      Ahmed, in order to obtain access to the Clinics' patient base (<u>i.e.</u>, Insureds), entered into illegal kickback and referral arrangements with unlicensed persons and/or healthcare professionals, including John Doe Defendants, who "brokered" or "controlled" access to patients treated, or purported to be treated, at the Clinics.

**a.   Ahmed Did Not Obtain Patients for the PC Defendants Legitimately**

63.      Ahmed did not have his own patients at the Clinics and did nothing to create a patient base.

64.      Ahmed did not market the existence of any of the PC Defendants or the Fraudulent Services to the general public.

65.      Ahmed did not advertise for patients, did not maintain any website, and never sought to build name recognition or make any legitimate efforts of his own to attract patients on behalf of any of the PC Defendants.

66.      Ahmed and the PC Defendants were not the owners or leaseholders of the real property from which they purported to provide the Fraudulent Services.

67.      Ahmed did virtually nothing that would be expected of the owner of legitimate medical professional corporations to develop their reputation and attract patients to the Clinics.

68.      As Ahmed did not have any patients of his own at the Clinics, the healthcare services that he could provide to the patients at the Clinics were limited and dictated by the unlicensed laypersons and/or healthcare professionals, including John Doe Defendants, who

controlled access to patients at the Clinics and were interested only in maximizing profits without regard to genuine patient care.

69.     Ahmed testified on behalf of several of the PC Defendants at multiple Examinations Under Oath ("EUO") that the only source of patients for the respective PC Defendants was through "word of mouth."

70.     In reality, the only "word of mouth" through which the Insureds learned about the PC Defendants was that of the unlicensed laypersons and/or healthcare professionals associated with the Clinics, including John Doe Defendants, who directed the Insureds to subject themselves to the Fraudulent Services, solely because of the illegal kickbacks paid by Ahmed and the PC Defendants.

71.     Ahmed further testified at multiple EUOs regarding his relationship with many of the Clinics. For each Clinic about which he was asked, Ahmed testified that "word of mouth" was also how he learned about the opportunity to provide services to patients at each Clinic.

72.     Tellingly, each time he was asked at the EUOs, Ahmed claimed that he was unable to recall any additional details whatsoever regarding how he learned about the opportunity to provide services at even a single Clinic, including who told him about the Clinic, when he learned about the Clinic, or where he was when he learned about the opportunity to see patients at the Clinic.

73.     In truth, Ahmed learned about the Clinics pursuant to his relationships with John Doe Defendants and because of his willingness to enter into illegal kickback and referral arrangements enabling the PC Defendants to obtain access to patients at numerous Clinics and thereby generate large volumes of fraudulent billing to no-fault insurance carriers, including GEICO.

74.     At bottom, neither Ahmed nor any other medical professional that may have rendered services under the names of the PC Defendants at the Clinics had a genuine doctor-patient relationship with the Insureds that visited the No-Fault Clinics, as the Insureds had no scheduled appointments with Ahmed or the PC Defendants specifically.

67.     In fact, the Insureds were simply directed by the Clinics, and the unlicensed laypersons and/or healthcare professionals associated therewith, to subject themselves to treatment by whatever individual was working for the PC Defendants and the other medical providers on that given day, because of the illegal kickbacks paid by the Defendants.

**b.  The Clinics Exist to Facilitate No-Fault Insurance Fraud**

75.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, virtually all of the Clinics in actuality were organized to supply "one-stop" shops for no-fault insurance fraud.

76.     At many of the Clinics, unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base, and dictated fraudulent protocols used to maximize profits without regard to actual patient care.

77.     The Clinics provided facilities for the PC Defendants, as well as a "revolving door" of medical professional corporations, chiropractic professional corporations, physical therapy professional corporations and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

78.     In fact, at many of the Clinics, GEICO received billing from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance

company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

79.    For example, GEICO has received billing for purported healthcare services rendered at the clinics located at 2488 Grand Concourse, Bronx, 615 Seneca Avenue, Queens, and 79-45 Metropolitan Avenue, Middle Village from a "revolving door" of more than 100 purportedly different healthcare providers.

80.    GEICO has received billing for purported healthcare services rendered at the clinic located at 513 Church Avenue, Brooklyn by a "revolving door" of more than 75 purportedly different healthcare providers.

81.    GEICO has received billing for purported healthcare services rendered at the clinic located at 1655 Richmond Avenue, Staten Island from a "revolving door" of more than 70 different purported healthcare providers.

82.    GEICO has received billing for purported healthcare services rendered at the clinics located at 82-25 Queens Boulevard, Woodside, NY and 332 East 149th Street, Bronx, NY, from a "revolving door" of more than 40 purportedly different healthcare providers.

83.    Furthermore, certain of the providers who operated from the Clinics and were associated with the PC Defendants have a history of professional misconduct that limited their opportunity to find employment at legitimate medical offices or to develop their own legitimate practices, leaving them to work for unlicensed laypersons at the Clinics with their fraudulent treatment and billing protocols.

84.    For example, Joseph A. Raia MD, P.C. (the "Raia P.C.") is a professional corporation allegedly owned by Joseph Raia, M.D. ("Dr. Raia"), which was a source of referrals of Insureds to one or more of the PC Defendants for the Fraudulent Services.

85.     In 2014, Dr. Raia was charged by the Office of Inspector General with submitting false and fraudulent claims to Medicare for services that he never provided. As a result of those charges Dr. Raia was excluded from participating in all federal healthcare programs for fifteen years and was required to pay $1.5 million in penalties.

86.     Another physician who purportedly served as a referral source of Insureds for one or more of the PC Defendants is S. Ramachandran Nair, M.D., who pled guilty in 2003 to, among other things, submitting a false Medicaid claim and was excluded from participating in all federally funded health care programs for five years. Thereafter in 2006, he was placed on probation by the New York State Board after being charged with two counts of professional misconduct.

87.     In keeping with the fact that unlicensed laypersons controlled many of the Clinics and that Ahmed and the PC Defendants paid illegal kickbacks in exchange for patient referrals, several of the Clinics from which Ahmed and the PC Defendants operated are identified in United States of America v. Anthony Rose, et al., 19-cr-00789 (PGG) (S.D.N.Y.) ("USA v. Rose") as being controlled by laypersons and as receiving patients as a result of illegal kickback and referral arrangements.

88.     In USA v. Rose, numerous individuals were indicted in November 2019 for paying bribes to 911 operators, medical personnel, NYPD officers, and others in exchange for confidential patient information. To exploit the patient information, Anthony Rose ("Rose"), the ringleader of the scheme, set up a fully staffed call center in order to contact the patients and to steer them to a preferred network of medical clinics (and lawyers) in New York and New Jersey.  Specifically, the medical clinics, including some of the Clinics where the PC Defendants operated, were deemed preferred because the clinic controllers paid Rose kickbacks in exchange for the referrals.

89.     Recently, Government affidavits filed in support of surveillance warrants, including wiretaps, were unsealed in <u>USA v. Rose</u>. These affidavits detail the massive scope of the patient brokering scheme, reveal the identity of numerous layperson controllers and fraudulent clinic locations, and expressly implicate several of the Clinics where Ahmed and the PC Defendants operated. <u>See</u> <u>USA v. Rose</u>, ECF No. 398.

90.     Contrary to Ahmed's EUO testimony that the PC Defendants received patients solely through "word of mouth," the Government affidavits unsealed in <u>USA v. Rose</u> include excerpts of wiretaps and other evidence indicating that, among dozens of other locations, patients were steered to the following layperson-controlled Clinics: 105-10 Flatlands Avenue, Brooklyn; 2273 65th Street, Brooklyn; 204-12 Hillside Avenue, Hollis; 2426 Eastchester Road, Bronx; 332 East 149th Street, Bronx; 488 Lafayette Avenue, Brooklyn; 60-40 82nd Street, Middle Village; and 69-37 Myrtle Avenue, Glendale.

91.     What is more, several of the Clinics where the PC Defendants rendered the Fraudulent Services are associated with Metro Pain Specialists P.C. ("Metro Pain"), a professional corporation that has been named as a defendant in multiple no-fault insurance fraud cases involving fraudulent services billed to No-fault insurers based on allegations that it was controlled by laypersons and engaged in illegal kickback and referral arrangements. <u>See</u> <u>State Farm Mut. Ins. Co., et al. v. Metro Pain Specialists, P.C., et al</u>, 21-cv-05523 (E.D.N.Y.); <u>Allstate Ins. Co., et al. v. Metro Pain Specialists P.C., et al.</u>, 21-cv-05586 (E.D.N.Y.) (collectively, the "<u>Metro Pain Cases</u>"). These Clinics include: 105-10 Flatlands Avenue, Brooklyn; 1122 Coney Island Avenue, Brooklyn; 135 Eastern Parkway, Brooklyn; 1767 Southern Boulevard, Bronx; 204-12 Hillside Avenue, Hollis; 488 Lafayette Avenue, Brooklyn; 560 Prospect Avenue, Bronx; and 90-16 Sutphin Boulevard, Jamaica.

92.     Further demonstrating that fraudulent activity permeated many of the Clinics from which Ahmed and the PC Defendants operated, a chiropractor who worked at the Clinic located at 615 Seneca Avenue, Queens, attested to the fact that prescriptions for durable medical equipment that contained the chiropractor's name were not actually signed, reviewed, or authorized by him, but instead contained photocopies of his signature and were fraudulently copied and issued without his knowledge and consent.

### c.  Ahmed and the PC Defendants Paid Illegal Kickbacks in Exchange for Access to the Clinics' Patients

93.     Ahmed and the PC Defendants, as a precondition to seeing patients at the Clinics, were required to pay kickbacks in exchange for the referral of Insureds.

94.     The financial arrangements that Ahmed and the PC Defendants entered into included: (i) payments to the leaseholders at the Clinics disguised as "rent" for office space and/or personnel; and (ii) payments to a series of shell companies disguised as, among other things, putative "marketing," "advertising," "consulting," "transportation," "cleaning," "administrative," and "construction" companies.

95.     However, the financial arrangements that Ahmed and the PC Defendants entered into were actually "pay-to-play" arrangements that caused unlicensed laypersons to steer Insureds to the PC Defendants for medically unnecessary services at the Clinics.

96.     In keeping with the fact that the ostensibly legitimate "rent" payments by Ahmed and the PC Defendants were actually disguised kickbacks in exchange for patient referrals, the amounts of the "rental" payments were far in excess of the legitimate, fair market value of the putative non-exclusive use of the clinic locations.

97.     For example, ENS Medical, ECMC, and Queens Medical purported to have lease agreements whereby they paid, at multiple Clinics, approximately $750.00 to $2,000.00 per month

in purported "rent," despite the fact that they used non-exclusive space and typically rendered services only once or twice per month at the respective Clinics.

98.      In addition, among the handful of Clinics that were there shared among two PC Defendants, Ahmed operated ECMC and ENS Medical concurrently at several of those Clinics.

99.      Despite the fact that either ENS Medical or ECMC had a lease agreement with a Clinic and therefore already had the right to use the office space, Ahmed entered into a second lease agreement on behalf of either ENS Medical or ECMC (as the case may be) for use of the office space at the shared Clinics.

100.     In keeping with the fact that the rent payments were, in fact, illegal kickback payments made to access patients rather than merely for use of office space, Ahmed paid "rent" twice in the same month—once through ENS Medical and once through ECMC—to the unlicensed laypersons and/or healthcare professionals for use of the office space during the time that ENS Medical and ECMC operated concurrently at those Clinics.

101.     In addition to the sham payment of rent, Ahmed effectuated the payment of kickbacks by, among other things, paying entities that purported to provide legitimate business services, such as "marketing," "advertising," "consulting," "transportation," "cleaning," "administrative," and "construction" services, but which actually had no legitimate operations and provided no legitimate services (the "Shell Companies"). Instead, the Shell Companies were used as vehicles to conceal payments made to other entities (the "Referral Sources") as kickbacks in exchange for patient referrals.

102.     For example, in exchange for patient referrals, Ahmed made at least $110,000.00 worth of payments from a corporate bank account associated with his professional corporation, Queens Corona Medical, P.C. ("Queens Corona"), to the Shell Companies, including payments to

(i) a purported network services company totaling at least $32,000.00; (ii) a purported professional administrative services company totaling at least $22,000.00; (iii) a purported computer and network services company totaling at least $13,000.00; and (iv) a purported litigation support company totaling at least $14,000.00.

103.    Ahmed's kickback payments from the Queens Corona corporate bank account also included thousands of dollars in payments to entities associated with Nathan Yusufov ("Yusufov"). Yusufov was indicted for his participation in a $146 million-dollar health care fraud scheme based on allegations that, among other things, he utilized (i) "recruiters" who identified potential patients, offered cash to induce a person to become a patient, and coordinated their transportation to the affiliated medical clinics; (ii) owners, managers, and staff of medical clinics; and (iii) owners, managers, and staff of "shell" businesses and corporations that laundered the proceeds of the health care fraud.  See People v. Kristina Mirbabayeva, Indictment No. 9476/2017 (Kings Cty. 2017). On April 4, 2019, Yusufov pleaded guilty to, among other things, Money Laundering in the Third Degree.  At his plea allocution, Yusufov confirmed that he served as the "de facto manager" of several entities and that he knew that the property involved in one or more financial transactions of those entities represented the proceeds of health care fraud.

104.    In keeping with the fact that the payments from the Queens Corona corporate bank account were made to the Shell Companies and not legitimate entities, Ahmed issued approximately $6,000.00 in checks to Progress For Your Business, Inc. from Queens Corona's corporate bank account.  While these payments were ostensibly made to appear as if they were fees for legitimate services, these checks were actually exchanged for cash at a check-cashing facility by non-party Alla Kuratova ("Kuratova").

105.    In 2013, Kuratova was indicted for her involvement in a prescription drug trafficking ring, which included the recruitment of individuals to act as phony patients in visits with corrupt medical practitioners where they received prescriptions for medically unnecessary prescription pain medication.

106.    Ahmed funded the Queens Corona corporate bank account, almost exclusively, by writing checks from his personal bank accounts to Queens Corona.

107.    Upon information and belief, the monies in Ahmed's personal bank accounts that Ahmed used to fund the Queens Corona kickback payments initially came from payments he issued to himself from his professional corporations, including one or more of the PC Defendants.

108.    By paying himself from his professional corporations, including one or more of the PC Defendants, and then funneling monies from his personal bank accounts through Queens Corona, Ahmed made it appear as if the professional corporations were making legitimate salary or profit payments to its owner, when in fact, the professional corporations' payments to Ahmed were merely illegal kickback payments in transit, on their way to be laundered through various shell companies.

109.    Though Queens Corona's name gives it the appearance of a health care professional corporation, Queens Corona itself is a shell company, as it has never had any legitimate operations or provided any legitimate services. In fact, the true purpose for Queens Corona's existence was to funnel monies from Ahmed's personal bank accounts to the Shell Companies and, ultimately, the Referral Sources.

110.    Ahmed issued the checks to the Shell Companies out of Queens Corona's corporate bank account to conceal the true nature of the payments from insurers, including GEICO.

111.    In keeping with the fact that the payments made by Ahmed through Queens Corona were kickbacks in exchange for patient referrals, the Referral Sources to which the Shell Companies paid monies were some of the same companies paid by Tea Kaganovich and Ramazi Mitaishvili, who admitted to paying approximately $18.5 million in kickbacks for the referral of patients to their diagnostic testing facilities in Brooklyn, Queens, and the Bronx in connection with pleading guilty to health care fraud in the Eastern District of New York. United States of America v. Tea Kaganovich, Ramazi Mitaishvili, 17-CR-00649 (E.D.N.Y. 2019).

112.    In further keeping with the fact that Ahmed and the PC Defendants took steps to conceal the payment of the illegal kickbacks, ENS Medical's 2018 Federal Tax Return (Form 1120) listed $677,917 in "Other Deductions" which, upon information and belief, include the kickback payments that Ahmed and ENS Medical paid to access Insureds at the Clinics.

113.    Ahmed and the PC Defendants made the various kickback payments in exchange for having Insureds referred to one or more of the PC Defendants for the Fraudulent Services at the Clinics, regardless of the individual's symptoms, presentment, or actual need for additional treatment.

114.    The amount of money that Defendants paid in kickbacks generally was based on the volume of Insureds that were steered to the PC Defendants for the Fraudulent Services.

115.    The unlawful kickback and payment arrangements were essential to the success of the Defendants' fraudulent scheme.  The Defendants derived significant financial benefit from the relationships because without access to the Insureds, the Defendants would not have the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other insurers.

116.    Ahmed at all times knew that the kickbacks and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme.

117.     In fact, Ahmed split the Defendants' billing for the Fraudulent Services across multiple professional corporations in order to limit the amount of billing and type of services being submitted by each PC Defendant.

118.     Ahmed and the Defendants conducted their scheme through multiple medical professional corporations using different tax identification numbers, in order to reduce the volume of fraudulent billing submitted through any single entity using any single tax identification number, avoid detection, and thereby perpetuate their fraudulent scheme and increase their ill-gotten gains.

### C.      The Defendants' Fraudulent Treatment and Billing Protocol

119.     Regardless of the nature of the accidents or the actual medical needs of the Insureds, the PC Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentment.

120.     Each step in the PC Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

119.     Defendants' fraudulent treatment and billing protocol resulted in more than $5.4 million in billing to GEICO for medically unnecessary, experimental, excessive, illusory and/or bogus services, including examinations, videonystagmus ("VNG") testing, transcranial doppler tests ("TDT"), extracorporeal shockwave therapy ("ESWT"), nerve conduction velocity ("NCV") testing, and electromyography ("EMG") studies (*i.e.*, the "Fraudulent Services").

121.     No legitimate physician or other licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

Rather, the Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because they sought to profit from the fraudulent billing submitted to GEICO and other insurers.

### 1.    The Fraudulent Charges for Initial Examinations and Consultations

122.    Upon receiving a referral pursuant to the kickbacks that Ahmed and the PC Defendants paid to the unlicensed laypersons and/or healthcare professionals associated with the Clinics, including the John Doe Defendants, the Defendants purported to provide most of the Insureds in the claims identified in Exhibits "1" through "6" with an initial examination or consultation.

123.    In keeping with the fact that the initial examinations and consultations were performed pursuant to the kickbacks that Ahmed and the PC Defendants paid at the Clinics, the PC Defendants virtually always purported to perform the initial examinations and consultations at the Clinics where they obtained their initial referrals, rather than at any stand-alone practice.

124.    The initial examinations and consultations were performed as a "gateway" in order to provide a false basis to justify the Defendants' exploitation of the Insureds through the PC Defendants' respective medically unnecessary, excessive, experimental, and/or illusory services.

125.    In keeping with the fact that the PC Defendants' initial examinations and consultations were not genuine but simply a means to justify their ability to bill for additional services pursuant to a predetermined, fraudulent treatment protocol, the initial examinations and consultations resulted in virtually every Insured receiving at least one of other Fraudulent Services on the same date of service, immediately following the initial examination or consultation.

126.    Typically, someone associated with Ahmed and the PC Defendants purported to perform the initial examinations and consultations, which were then billed to GEICO through one of the PC Defendants.

127.    ENS Medical, Queens Medical, and Atlantic Medical usually billed their initial consultations under CPT code 99244, typically resulting in a charge of $236.94.  ENS Medical and Atlantic Medical occasionally billed its initial consultations under CPT code 99243, typically resulting in a charge of $181.23 or $248.34.

128.    Garden Medical and Town Medical billed virtually all of its initial consultations under 99241, typically resulting in a charge of $152.86.

129.    ENS Medical billed virtually all of its initial examinations under CPT code 99203, typically resulting in a charge of $135.37.

130.    ECMC billed virtually all of its initial examinations under CPT code 99201, typically resulting in a charge of $87.80.

131.    The charges for the initial examinations and consultations were fraudulent in that the examinations and consultations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the kickbacks that the Defendants paid at the Clinics in coordination with the John Doe Defendants, not to treat or otherwise benefit the Insureds.

132.    Furthermore, the PC Defendants charges for the initial examinations and consultations were fraudulent in that they misrepresented the nature and extent of the initial examinations and consultations.

133.    For example, in every claim identified in Exhibits "1," "2," and "6" for initial examinations and consultations under CPT codes 99244, 99243, and 99203, ENS Medical, Queens

Medical, and Atlantic Medical misrepresented and exaggerated the amount of face-to-face time that the examining healthcare professional spent with the Insureds or the Insureds' families.

134. The use of CPT code 99244 typically requires that a healthcare professional spend 60 minutes of face-to-face time with the Insured or the Insured's family.

135. The use of CPT code 99243 typically requires that a healthcare professional spend 40 minutes of face-to-face time with the Insured or the Insured's family.

136. The use of CPT code 99203 typically requires that a healthcare professional spend 30 minutes of face-to-face time with the Insured or the Insured's family.

137. Though ENS Medical, Queens Medical, and Atlantic Medical billed almost all of their respective initial examinations and consultations under CPT codes 99244, 99243, and 99203, no healthcare professional associated with the Defendants spent 30 minutes, let alone 45 or 60 minutes, on an initial examination.

138. Rather the initial examinations and consultations in the claims identified in Exhibits "1," "2," and "6" rarely lasted more than 10 to 15 minutes.

139. In keeping with the fact that ENS Medical, Queens Medical, and Atlantic Medical's respective initial examinations and consultations rarely lasted more than 10 to 15 minutes, ENS Medical, Queens Medical, and Atlantic Medical's respective purported initial examinations and consultations were documented using pre-printed checklist or templated forms.

140. The pre-printed checklist or template forms that Ahmed, ENS Medical, Queens Medical, and Atlantic Medical used in conducting the initial examinations and consultations set forth a limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

141.    All that was required to complete the pre-printed checklist or templated forms was a brief patient interview and a perfunctory physical examination of the Insureds.

142.    These interview and examinations did not require the Defendants to spend more than 10 to 15 minutes of face-to-face time with the Insureds during the putative initial examinations and consultations.

143.    For their part, ECMC, Garden Medical, and Town Medical, in every claim identified in Exhibits "3" through "5" for initial examinations and consultations under CPT codes 99201 and 99241, also misrepresented and exaggerated the amount of face-to-face time that the examining healthcare professional spent with the Insureds or the Insureds' families.

144.    The use of CPT code 99241 typically requires that a healthcare professional spend 15 minutes of face-to-face time with the Insured or the Insured's family.

145.    The use of CPT code 99201 typically requires that a healthcare professional spend 10 minutes of face-to-face time with the Insured or the Insured's family.

146.    Though ECMC, Garden Medical, and Town Medical billed virtually all of their respective initial examinations and consultations under CPT codes 99201 and 99241, no healthcare professional associated with the Defendants spent even 10 minutes on an initial examination or consultation, to the extent any were performed at all.

147.    In keeping with the fact that the ECMC, Garden Medical, and Town Medical's initial examinations and consultations did not even last 10 minutes, ECMC, Garden Medical, and Town Medical's initial examinations and consultations were virtually always documented via: one handwritten or typed sentence; one set of check boxes detailing the patient's complaints at very high levels of generality, such as "cervical," "thoracic" or "lumbar"; and one limited set of diagnoses to consider.

148.    What is more, the initial "examinations" and "consultations" performed by ECMC, Garden Medical, and Town Medical did not include any physical examination whatsoever.

149.    In keeping with the fact that ECMC, Garden Medical, and Town Medical did not perform any physical examination, ECMC, Garden Medical, and Town Medical purported to support their initial examinations and consultations with virtually identical, boilerplate examination forms for every Insured.

150.    By way of example, the following is the "Pre-Procedure Evaluation" containing ECMC's physical examination "findings" for virtually every Insured:

**Pre-Procedure Evaluation:**

Based on the objective findings today, active, and passive ROM is decreased moderately, and palpation findings indicate mild to moderate pain and patient reports 7/10 pain level in VAS and difficulty with ADLS of moderately severity. Based on these findings and the review of the available medical records, it is appropriate for this patient to proceed with initial RPW therapy.

151.    By way of example, the following is the "Pre-Procedure Evaluation" containing Garden Medical's physical examination "findings" for virtually every Insured:

**Pre-Procedure Evaluation:**

Based on the objective findings today, active, and passive ROM is decreased moderately, and palpation findings indicate at least mild to moderate pain and patient reports at least a 7/10 pain level in VAS and difficulty with ADLS of moderately severity. Based on these findings and the review of the available medical records, it is appropriate for this patient to proceed with initial RPW therapy.

152.    By way of example, the following is the "Pre-Procedure Evaluation" containing Town Medical's physical examination "findings" for virtually every Insured:

**Pre-Procedure Evaluation:**

Based on the objective findings today, active, and passive ROM is decreased moderately, and palpation findings indicate at least moderate to severe pain with the patient reporting at least a 7/10 pain level in VAS and difficulty with ADLS of moderate severity. Based on these findings and the review of the available medical records, it is appropriate for this patient to proceed with initial RPW therapy.

153.     In keeping with the fact that it would be impossible for hundreds of Insureds, each with their own unique set of individualized circumstances, to all have the exact same "findings" following an initial examination or consultation, ECMC, Garden Medical, and Town Medical did not actually perform a "Pre-Procedure Evaluation" or any physical examination of the patient.

154.     Instead, the "Pre-Procedure Evaluation" was included in the report to make it appear as if ECMC, Garden Medical, and Town Medical had performed a physical examination of the patient, when, in fact, they did not.

155.     All that was required to complete ECMC, Garden Medical, and Town Medical's boilerplate forms was to ask the patient to list their subjective complaints and check off the diagnoses that matched those subject complaints.

156.     Pursuant to the Fee Schedule, when ENS Medical, Queens Medical, and Atlantic Medical submitted charges for initial consultations under CPT codes 99244, or caused them to be submitted, they falsely represented that an associated healthcare professional: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "moderate complexity."

157.     Further, pursuant to the Fee Schedule, when ENS Medical and Atlantic Medical submitted charges for initial examinations and consultations under CPT codes 99243 or 99203, or caused them to be submitted, they falsely represented that an associated healthcare professional: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "low complexity."

158.     Lastly, pursuant to the Fee Schedule, when ECMC, Garden Medical, and Town Medical submitted their respective charges for initial examinations and consultations under CPT codes 99201 and 99241, or caused them to be submitted, they false represented that an associated

healthcare professional: (i) took a "problem focused" patient history; (ii) conducted a "problem focused" examination; and (iii) engaged in "straightforward" medical decision making.

### a.    Misrepresentations Regarding the Performance of Consultations

159.    Pursuant to the Fee Schedule, the use of CPT codes 99244, 99243, and 99241 to bill for an initial patient encounter represents that the examining physician performed a "consultation" at the request of another physician or other appropriate source.

160.    However, ENS Medical, Queens Medical, Garden Medical, Town Medical, and Atlantic Medical (the "Consultation Defendants") did not provide their purported "consultations" – to the extent that they are provided at all – pursuant to a legitimate referral from any other physician or other appropriate source. Rather, to the extent that the putative "consultations" were performed in the first instance, they were performed as a result of the illegal kickback payments and pursuant to the respective Consultation Defendants' fraudulent treatment protocol in order to generate billing for the Consultation Defendants.

161.    In keeping with the fact that the Consultation Defendants did not provide their purported "consultations" at the request of another physician or appropriate source, the supposed "results" of the putative "consultations" were neither transmitted back to any referring physicians or other appropriate sources, nor were the supposed "results" of the putative "consultations" incorporated into any of the Insureds' treatment plans, or otherwise acted upon in any way.

162.    Pursuant to the Fee Schedule, the use of CPT codes 99244, 99243, and 99241 to bill for a patient consultation represents that the physician who performed the consultation submitted a written consultation report to the physicians or other appropriate sources who purportedly requested the consultations in the first instance.

163.    However – and, again, in keeping with the fact that the Consultation Defendants did not provide their purported "consultations" at the request of another physician or appropriate source – Defendants did not submit any written consultation report to any referring physician or other healthcare provider.

164.    In the claims for purported "consultations" identified in Exhibits "1," "2," "4," "5," and "6" the Consultation Defendants misrepresented the underlying services to be consultations billable under CPT codes 99244, 99243, and 99241 because such consultations are reimbursable at a higher rate than commensurate patient examinations.

**b.    Misrepresentations Regarding "Comprehensive" and "Detailed" Patient Histories**

165.    Pursuant to the Fee Schedule, when ENS Medical, Queens Medical, and Atlantic Medical submitted charges for initial consultations under CPT code 99244, they represented that they took a "comprehensive" patient history.

166.    In addition, pursuant to the Fee Schedule, when ENS Medical and Atlantic Medical submitted charges for initial examinations and consultations under CPT codes 99243 and 99203, they represented that they took a "detailed" patient history.

167.    Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, a patient history does not qualify as "comprehensive" unless the physician has conducted a "complete" review of the patient's systems.

168.    Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a patient's systems unless the physician has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

169.   The CPT Assistant recognizes the following organ systems with respect to a review of systems:

(i)      constitutional symptoms (e.g., fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)    cardiovascular;

(v)     respiratory;

(vi)    gastrointestinal;

(vii)   genitourinary;

(viii)  musculoskeletal;

(ix)    integumentary (skin and/or breast);

(x)     neurological;

(xi)    psychiatric;

(xii)   endocrine;

(xiii)  hematologic/lymphatic; and

(xiv)  allergic/immunologic.

170.   When ENS Medical, Queens Medical, and Atlantic Medical billed for the initial consultations under CPT code 99244, they falsely represented that they took a "comprehensive" patient history from the Insureds they purported to treat during the initial consultations.

171.   In fact, ENS Medical, Queens Medical, and Atlantic Medical did not take a "comprehensive" patient history from the Insureds they purported to treat during the initial consultations, because they did not document a review of the systems directly related to the history

of the patients' present illnesses or a review of 10 organ systems unrelated to the history of the patients' present illnesses.

172.    Furthermore, pursuant to the CPT Assistant, a "detailed" patient history requires – among other things – that the examining physician take a history of systems related to the patient's presenting problems, as well as a review of a limited number of additional systems.

173.    However, ENS Medical and Atlantic Medical did not take a "detailed" patient history from Insureds during its initial examinations and consultations, inasmuch as they did not review systems related to the patients' presenting problems and did not conduct any review of a limited number of additional systems.

174.    Rather, after purporting to provide the initial examinations and consultations, ENS Medical, Queens Medical, and Atlantic Medical simply prepared reports containing ersatz patient histories in order to justify the performance of the Fraudulent Services.

175.    These patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the: (i) purported diagnoses that did not correlate with the patient's actual symptoms or concerns; and (ii) the PC Defendants' billing to GEICO, and other insurers, for the Fraudulent Services that they purported to provide.

   c.    **Misrepresentations Regarding "Comprehensive," "Detailed," and "Problem Focused" Physical Examinations**

176.    Pursuant to the Fee Schedule, a physical examination does not qualify as "comprehensive" unless the healthcare provider either: (i) conducts a general examination of

multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

177.   Further, pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

178.   Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)   at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)   the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)   palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)   examination of gait and station;

(vi)   examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

(ix)   mental status, including orientation to time, place and person, as well as mood and affect.

179.    When ENS Medical, Queens Medical, and Atlantic Medical billed for the initial consultations under CPT code 99244 they falsely represented that they performed a "comprehensive" patient examination on the Insureds they purported to treat during the initial consultations.

180.    In fact, ENS Medical, Queens Medical, and Atlantic Medical did not conduct a general examination of multiple patient organ systems or conduct a complete examination of a single patient organ system.

181.    For instance, ENS Medical, Queens Medical, and Atlantic Medical did not conduct any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

182.    Furthermore, although ENS Medical, Queens Medical, and Atlantic Medical often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems during their putative initial consultations, the musculoskeletal examinations did not qualify as "complete," because they failed to document:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)    coordination, deep tendon reflexes, and sensation; and/or

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

183.    Pursuant to the Fee Schedule, a "detailed" physical examination requires – among other things – that the healthcare services provider conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

184.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)    measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)    brief assessment of mental status;

(vi)    examination of gait and station;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)    coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)    examination of sensation.

185.    When ENS Medical and Atlantic Medical billed for their respective initial examinations and consultations under CPT codes 99243 and/or 99203, ENS Medical and Atlantic Medical falsely represented that they performed a "detailed" patient examination on the Insureds they purported to treat during the initial examinations and consultations.

186.    In fact, ENS Medical and Atlantic Medical did not conduct a detailed patient examination of Insureds, inasmuch as they did not conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

187.    Pursuant to the Fee Schedule, a physical examination does not qualify as "problem focused" unless the healthcare provider conducts a limited examination of the affected body area or organ system.

188.    When ECMC, Garden Medical, and Town Medical billed for their respective initial examinations and consultations under CPT codes 99201 and 99241, ECMC, Garden Medical, and Town Medical falsely represented that they performed "problem focused" examinations on the Insureds it purported to treat during the initial examinations and consultations.

189.    As detailed above, ECMC, Garden Medical, and Town Medical's initial examinations and consultations did not meet the low threshold of "problem focused" because, in reality, ECMC, Garden Medical, and Town Medical did not perform any legitimate physical examination of the Insureds.

####      d.      Misrepresentations Regarding the Extent of Medical Decision-Making

190.     Similarly, ENS Medical, Queens Medical, and Atlantic Medical submitted charges for initial consultations under CPT code 99244, they represented that they engaged in medical decision-making of "moderate complexity."

191.     When the ENS Medical submitted charges for initial examinations and consultations under CPT code 99203, ENS Medical represented that it engaged in medical decision making of "low complexity."

192.     Lastly, when ECMC, Garden Medical, and Town Medical submitted charges for initial examinations and consultations under CPT codes 99201 and 99241, they represented that they engaged in "straightforward" medical decision-making.

193.     Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

194.     Though the Defendants routinely falsely represented that their initial examinations and consultations involved medical decision-making of "moderate complexity" (when billed under CPT code 99244), "low complexity" (when billed under CPT codes 99243 and 99203) or a "straightforward" nature (when billed under CPT codes 99241 and 99201), in actuality the initial examinations and consultations did not involve any medical decision-making at all, and, in the unlikely event that an Insured did present with injuries or symptoms with any degree of

complexity, the deficient initial examinations and consultations were incapable of assessing and/or diagnosing them as such.

195.   First, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

196.   Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the PC Defendants, to the extent that the PC Defendants provided any such diagnostic procedures or treatment options in the first instance.

197.   In almost every instance, any diagnostic procedures and "treatments" that the PC Defendants actually provided were limited to either a series of medically unnecessary diagnostic tests or experimental and investigational ESWT, none of which were health or life-threatening if properly administered.

198.   Second, the PC Defendants did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

199.   In fact, no healthcare professional associated with the PC Defendants engaged in any medical decision-making at all. Rather, the outcome of the initial examinations and consultations were pre-determined for virtually every Insured to result in boilerplate "diagnoses" that merely: (i) matched the patients' subjective complaints; and (ii) added diagnoses that would justify performance of the particular PC Defendants' fraudulent services.

200.   For example, in keeping with the fact that ENS Medical and Atlantic Medical performed EMG/NCV studies on virtually every Insured that received an initial examination or consultation, the result of virtually every ENS Medical and Atlantic Medical initial examination

or consultation included diagnoses of cervical and/or lumbar sprains and strains and cervical and/or lumbar radiculopathy in order to justify performance ENS Medical and Atlantic Medical's impending performance of EMG/NCV studies.

201.    Likewise, in keeping with the fact that Queens Medical performed EMG/NCV on the vast majority of its Insureds, the vast majority of Queens Medical's initial consultations included diagnoses of cervical and/or lumbar sprains and strains and cervical and/or lumbar radiculopathy in order to justify performance of Queens Medical's impending performance of EMG/NCV studies.

202.    Similarly, in keeping with the fact that ECMC, Garden Medical, and Town Medical performed ESWT on virtually every Insured that received an initial examination or consultation, the result of virtually every ECMC, Garden Medical, and Town Medical initial examination or consultation included diagnoses of cervicalgia (neck pain), thoracic pain, and/or low back pain in order to justify ECMC, Garden Medical, and Town Medical's impending performance of ESWT.

203.    In sum, the initial examinations and consultations did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the particular Fraudulent Services that the respective PC Defendants purported to perform and then billed to GEICO and other insurers.

## 2.    The Fraudulent Charges for Follow-Up Examinations

204.    In addition to their fraudulent initial examinations, Queens Medical, ECMC, Garden Medical, and Town Medical often purported to subject the Insureds in the claims identified in Exhibits "2" through "5" to multiple fraudulent follow-up examinations during the course of the Defendants' fraudulent treatment and billing protocol.

205.    Queens Medical typically billed the follow-up examinations to GEICO under CPT code 99214, most often resulting in a charge of $127.41.

206.    ECMC, Garden Medical, and Town Medical virtually always billed the follow-up examinations to GEICO under CPT code 99212, typically resulting in a charge of $68.82.

207.    Like the Defendants' charges for the initial examinations, the charges for the follow-up examinations were fraudulent in that the follow-up examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the illegal kickback and financial arraignments, referral schemes and fraudulent treatment protocol.

208.    The charges for the follow-up examinations also were fraudulent in that they misrepresented the nature, extent, and results of the follow-up examinations.

209.    For example, the charges for follow-up examinations submitted by ECMC, Garden Medical, and Town Medical were not supported by any report from a healthcare professional (or anyone) indicating that a follow-up examination of any kind had been performed.

**3.    The Fraudulent Charges for Electrodiagnostic Testing**

210.    Based upon the fraudulent, pre-determined "diagnoses" that they purported to provide to Insureds during the purported initial examinations and consultations, ENS Medical, Queens Medical, and Atlantic Medical (the "EDX Defendants") purported to subject many of the Insureds in the claims identified in Exhibits "1," "2," and "6" to a series of medically unnecessary electrodiagnostic tests, including NCV and EMG tests (collectively, the "electrodiagnostic" or "EDX" tests).

211.    Like the charges for the other Fraudulent Services, the charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the kickbacks that Ahmed and the EDX

Defendants paid at the Clinics in coordination with the John Doe Defendants, not to treat or otherwise benefit the Insureds.

**a.      The Human Nervous System and Electrodiagnostic Testing**

212.    The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

213.    Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

214.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

215.    The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

216.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs including pain, altered sensation, loss of muscle control, and alteration of reflexes.

217.    EMG tests and NCV tests are forms of electrodiagnostic tests, and purportedly were provided by Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

218.    The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

219.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

### b.    The Fraudulent Charges for NCV Tests

220.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin.

221.    An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude") and calculates the speed at which the nerve conducts the impulse over a measured distance from one stimulus to another (the "conduction velocity").

222.    In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

223.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

224.    F-wave and H-reflex studies are additional types of NCV tests that may be performed in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory nerve NCV tests are designed to evaluate nerve conduction in nerves within a limb.

225.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of two sensory nerves; (ii) NCV tests of three motor nerves; and (iii) two H-reflex studies.

226.    Even so, in an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, the EDX Defendants routinely purported to perform testing on far more nerves than recommended by the Recommended Policy.

227.    Specifically, to maximize the fraudulent charges they could submit to GEICO and other insurers, the EDX Defendants routinely purported to perform and/or provide: (i) NCV tests of 10 sensory nerves; (ii) NCV tests of 8 motor nerves; (iii) multiple F-wave studies; and (iv) at least two H-reflex studies.

228.    For example:

  (i)    On April 11, 2019, ENS Medical purported to provide: (i) 10 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies to an Insured named JWA. ENS Medical then billed GEICO approximately $2,636.44 for these tests.

(ii) On January 30, 2019, ENS Medical purported to provide: (i) 10 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies to an Insured named JA.  ENS Medical then billed GEICO approximately $2,636.44 for these tests.

(iii) On March 19, 2019, ENS Medical purported to provide: (i) 10 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies to an Insured named MB.  ENS Medical then billed GEICO approximately $2,636.40 for these tests.

(iv) On March 5, 2020, ENS Medical purported to provide: (i) 10 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies to an Insured named GA.  ENS Medical then billed GEICO approximately $2,796.44 for these tests.

(v) On March 11, 2019, ENS Medical purported to provide: (i) 10 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies to an Insured named ER. ENS Medical then billed GEICO approximately $2,636.44 for these tests.

(vi) On October 11, 2018, ENS Medical purported to provide: (i) 10 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies to an Insured named ALH. ENS Medical then billed GEICO approximately $2,636.40 for these tests.

(vii) On July 25, 2019, ENS Medical purported to provide: (i) 10 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies to an Insured named DS. ENS Medical then billed GEICO approximately $2,636.40 for these tests.

(viii) On June 4, 2018, ENS Medical purported to provide: (i) 10 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies to an Insured named WK. ENS Medical then billed GEICO approximately $2,636.40 for these tests.

(ix) On June 9, 2017, Queens Medical purported to provide: (i) 10 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies to an Insured named HJ. Queens Medical then billed GEICO approximately $4,900.00 for these tests.

(x) On August 23, 2017, Queens Medical purported to provide: (i) 10 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies to an Insured named JAR. Queens Medical then billed GEICO approximately $4,900.00 for these tests.

(xi)     On August 26, 2017, Queens Medical purported to provide: (i) 10 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies to an Insured named BD. Queens Medical then billed GEICO approximately $4,900.00 for these tests.

(xii)    On March 14, 2018, Queens Medical purported to provide: (i) 10 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies to an Insured named TC. Queens Medical then billed GEICO approximately $4,900.00 for these tests.

(xiii)   On May 25, 2018, Queens Medical purported to provide: (i) 10 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; (iii) two motor nerve NCV tests without F-wave studies; and (iv) two H-reflex studies to an Insured OC. Queens Medical then billed GEICO approximately $4,900.00 for these tests.

(xiv)    On May 2, 2016, Queens Medical purported to provide: (i) 10 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; (iii) two motor nerve NCV tests without F-wave studies; and (iv) two H-reflex studies to an Insured MA. Queens Medical then billed GEICO approximately $4,900.00 for these tests.

(xv)     On August 16, 2017, Queens Medical purported to provide: (i) 10 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; (iii) and two H-reflex studies to an Insured JG. Queens Medical then billed GEICO approximately $4,900.00 for these tests.

(xvi)    On August 26, 2020, Atlantic Medical purported to provide: (i) 10 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; (iii) and two H-reflex studies to an Insured GD. Atlantic Medical then billed GEICO approximately $3,281.52 for these tests.

(xvii)   On February 26, 2020, Atlantic Medical purported to provide: (i) 10 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; (iii) and two H-reflex studies to an Insured JS. Atlantic Medical then billed GEICO approximately $3,281.52 for these tests.

(xviii)  On January 16, 2020, Atlantic Medical purported to provide: (i) 10 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; (iii) and two H-reflex studies to an Insured NB. Atlantic Medical then billed GEICO approximately $3,281.52 for these tests.

(xix)    On February 26, 2020, Atlantic Medical purported to provide: (i) 10 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; (iii) and two H-reflex studies to an Insured NA. Atlantic Medical then billed GEICO approximately $3,281.52 for these tests.

(xx)   On July 8, 2020, Atlantic Medical purported to provide: (i) 10 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; (iii) and two H-reflex studies to an Insured VI. Atlantic Medical then billed GEICO approximately $3,281.52 for these tests.

229.   Prior to October 1, 2020, assuming that all other conditions of coverage are satisfied, the Fee Schedule permitted lawfully licensed health care professionals in the metropolitan New York area to submit maximum charges of: (i) $106.47 under CPT code 95904 for each sensory nerve in any limb on which an NCV test is performed; (ii) $166.47 under CPT code 95903 for each motor nerve with F-wave in any limb on which NCV testing is performed; and (iii) $119.99 under CPT code 95934 for each H-reflex test that is performed on the nerves of any limb.

230.   As of October 1, 2020, when changes to the Fee Schedule went into effect for New York no-fault insurance claims, the Fee Schedule requires providers to submit billing for NCV testing under one CPT code based on the number of nerves tested.  For example, the Fee Schedule permits lawfully licensed healthcare professionals in the metropolitan New York area to submit a maximum charge of $953.46 under CPT code 95913 for NCV testing of 13 or more nerves.

231.   The EDX Defendants routinely purported to provide and/or perform NCVs on far more nerves than recommended by the Recommended Policy in order to maximize the fraudulent charges that they could submit to GEICO and other insurers, not because the NCV tests were medically necessary to determine whether the Insureds have radiculopathies or any other medical condition.

232.   What is more, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

233.    In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers.

234.    As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

235.    This concept is emphasized in the Recommended Policy, which states that:

> EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

236.    This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

237.    Even so, the EDX Defendants did not tailor the NCV tests they purported to perform and/or provide to the unique circumstances of each individual Insured.

238.    Instead, they applied a fraudulent "protocol" and purported to perform and/or provide NCV tests on the same peripheral nerves and nerve fibers in the overwhelming majority of the NCV test claims identified in Exhibits "1," "2," and "6."

239.    Though the EDX Defendants' NCV tests are allegedly provided to Insureds in order to determine whether the Insureds suffered from radiculopathies, there was no adequate neurological history and examination performed to create a foundation for the EDX testing. In actuality, the NCV tests were provided to Insureds – to the extent that they provided them at all – as part of the pre-determined, fraudulent treatment protocol designed to maximize the billing that could be submitted for each Insured.

240.    In keeping with the fact that the EDX Defendants' NCV tests were administered as part of a pre-determined, fraudulent treatment protocol designed to maximize billing rather than benefit the Insureds, the putative results of the NCV tests were often medically impossible.

241.    For example:

(i)     On April 11, 2019, ENS Medical purportedly provided NCV tests to an Insured named JWA. However, the results of the tests were medically impossible.  Specifically, the NCV test report measured the amplitudes for the: (i) right median motor nerve as "12.1" at the wrist and "13.1" at the elbow; (ii) right tibial motor nerve as "3.3" at the ankle and "3.5" at the Poplit; (iii) right ulnar motor nerve as "7.1" at the wrist and "9.0" at the elbow. However, it is medically impossible for the amplitude to increase: (i) between the wrist and elbow; and (ii) between the ankle and the Poplit. Moreover, the NCV test report measured the velocities for the: (i) left superior peroneal sensory nerve as "117"; and (ii) the right superior peroneal sensory nerve as "108."  However, these results greatly exceed the range of velocity results that are physiologically possible.

(ii)    On February 22, 2019, ENS Medical purportedly provided NCV tests to an Insured named GP. However, the results of the tests were medically impossible.  Specifically, the NCV test report measured the velocity of the right peroneal motor nerve as "0." While it is possible for a nerve to be unresponsive to NCV testing, the NCV test report measured the latency and amplitude of GP's right peroneal motor nerve and reported normal values for each. In this context, it is medically impossible for a nerve to have "0" velocity.

(iii)   On January 30, 2019, ENS Medical purportedly provided NCV tests to an Insured named JA.  However, the results of the tests were medically impossible.  Specifically, the NCV test report measured the amplitude for the right tibial motor nerve as "5.6" at the ankle and "7.3" at the Poplit. However, it is medically impossible for the amplitude to increase between the ankle and the Poplit.

(iv)    On January 21, 2021, ENS Medical purportedly provided NCV tests to an Insured named GM.  However, the results of the tests were medically impossible.  Specifically, the NCV test report measured the velocities of the: (i) left median motor nerve as "708"; and (ii) right median motor nerve as "690." However, these results greatly exceed the range of velocity results that are physiologically possible.

(v)     On March 19, 2019, ENS Medical purportedly provided NCV tests to an Insured named MB. However, the results of the tests were medically impossible. Specifically, the NCV test report measured the amplitude for the right ulnar motor nerve as "7.4" at the wrist and "9.3" at the elbow. However, it is medically impossible for the amplitude to increase between the wrist and the elbow.

(vi)     On May 6, 2017, Queens Medical purportedly provided NCV tests to an
         Insured named GHK.  However, the results of the tests were medically
         impossible.  Specifically, the NCV test report measured the amplitudes for
         the: (i) left ulnar motor nerve as "6.7" at the wrist and "7.0" at the B Elbow;
         and (ii) the right ulnar motor nerve as "7.4" at the wrist and "9.2" at the B
         Elbow. However, it is medically impossible for the amplitude to increase
         between the wrist and the B Elbow.

(vii)    On August 23, 2017, Queens Medical purportedly provided NCV tests to
         an Insured named SNK.  However, the results of the tests were medically
         impossible.  Specifically, the NCV test report measured the amplitude for
         the right median motor nerve as "5.8" at the wrist and "7.7" at the elbow.
         However, it is medically impossible for the amplitude to increase between
         the wrist and the elbow.

(viii)   On May 2, 2016, Queens Medical purportedly provided NCV tests to an
         Insured named MA.  However, the results of the tests were medically
         impossible.  Specifically, the NCV test report measured the amplitudes for
         the: (i) right peroneal motor nerve as "2.7" at the ankle and "7.9" at the B
         Fib; and (ii) left tibial motor nerve as "7.6" at the ankle and "10.2" at the
         Poplit.  However, it is medically impossible for the amplitude to increase:
         (i) between the ankle and the B Fib; and (ii) between the ankle and the
         Poplit.

(ix)     On August 5, 2016, Queens Medical purportedly provided NCV tests to an
         Insured named BO.  However, the results of the tests were medically
         impossible.  Specifically, the NCV test report measured the amplitudes for
         the: (i) right median motor nerve as "8.8" at the wrist and "12.2" at the
         elbow; and (ii) left ulnar motor nerve as "8.0" at the wrist and "10.4" at the
         elbow.  However, it is medically impossible for the amplitude to increase
         between the wrist and the elbow.

(x)      On July 7, 2019, Queens Medical purportedly provided NCV tests to an
         Insured named MM.  However, the results of the tests were medically
         impossible.  Specifically, the NCV test report measured the amplitude for
         the right ulnar motor nerve as "5.8" at the wrist and "8.0" at the elbow.
         However, it is medically impossible for the amplitude to increase between
         the wrist and the elbow.

(xi)     On January 16, 2020, Atlantic Medical purportedly provided NCV tests to
         an Insured named NB.  However, the results of the tests were medically
         impossible.  Specifically, the NCV test report measured the velocity of the
         right median motor nerve as "100." However, this result greatly exceeds the
         range of velocity results that are physiologically possible.

(xii)   On February 26, 2020, Atlantic Medical purportedly provided NCV tests to an Insured named NA. However, the results of the tests were medically impossible. Specifically, the NCV test report measured the amplitudes for the left peroneal motor nerve as "3.2" at the ankle and "5.2" at the B Fib. However, it is medically impossible for the amplitude to increase between the ankle and the B Fib. Further, the NCV test report measured the amplitude and velocity of the right superficial peroneal sensory nerve as 276.8 and 156, respectively. However, these results greatly exceed the range of amplitude and velocity results that are physiologically possible.

(xiii)   On July 8, 2020, Atlantic Medical purportedly provided NCV tests to an Insured named VI. However, the results of the tests were medically impossible. Specifically, the NCV test report measured the amplitudes for the: (i) left peroneal motor nerve as "4.7" at the ankle and "6.0" at the B Fib; (ii) right peroneal motor nerve as "2.8" at the ankle and "4.2" at the B Fib; and (iii) left median motor nerve as "10.1" at the wrist and "10.4" at the elbow. However, it is medically impossible for the amplitude to increase: (i) between the ankle and the B Fib; and (ii) between the wrist and elbow.

(xiv)   On August 26, 2020, Atlantic Medical purportedly provided NCV tests to an Insured named GD. However, the results of the tests were medically impossible. Specifically, the NCV test report measured the amplitudes for the: (i) left peroneal motor nerve as "1.6" at the ankle and "3.9" at the B Fib; and (ii) left ulnar motor nerve as "4.7" at the wrist and "6.4" at the elbow. However, it is medically impossible for the amplitude to increase: (i) between the ankle and the B Fib; and (ii) between the wrist and elbow.

(xv)   On February 26, 2020, Atlantic Medical purportedly provided NCV tests to an Insured named JS. However, the results of the tests were medically impossible. Specifically, the NCV test report measured the amplitudes for the: (i) right median motor nerve as "10.2" at the wrist and "12.5" at the elbow; and (ii) right ulnar motor motor nerve as "7.0" at the wrist and "8.1" at the elbow.  However, it is medically impossible for the amplitude to increase between the wrist and elbow.

242.   Legitimate licensed healthcare professions who are properly trained to perform NCV tests and review NCV testing results would review NCV testing results in "real time" as the NCV test was being performed, investigate the cause of such any medically impossible results, and either note the medically impossible NCV results in the NCV report or redo the NCV test after the cause of the medically impossible NCV results had been corrected.

243.     Instead of identifying, investigating, noting or correcting the medically impossible testing results, the EDX Defendants simply ignored them because addressing such results, as legitimate healthcare professional would, was not consistent with the EDX Defendants' fraudulent pre-determined treatment protocol.

244.     What is more, the EDX Defendants' "cookie-cutter" approach did not reflect individual care towards any patient and often failed to discuss and report abnormal findings after testing, particularly ones that conflicted with a radiculopathy diagnosis. For example, the EDX Defendants failed to note the presence of a "conduction block" in several Insureds' NCV tests. A conduction block is denoted in an NCV test by a finding that a nerve's motor amplitude was significantly lower when proximally stimulated than when distally stimulated. The presence of a conduction block is indicative of demyelination, a potentially very serious medical problem that could not have been related to any Insureds' automobile accident.

245.     The presence of a conduction block, however, is not consistent with a finding of radiculopathy. As the tests were performed solely for the purpose of profit and to justify continued treatment for the patient (and not for patient care), the EDX Defendants sought to diagnose radiculopathy based on whatever scant findings were present and ignored contrary testing abnormalities, even very serious ones such as conduction blocks. By omitting these abnormalities and simply finding radiculopathy, the EDX Defendants justified both their billing for the test being performed and the referring medical providers' and/or clinic controllers' subsequent billing for their medically unnecessary treatment. As a result, to the extent the NCV testing was performed at all and the results actually reflected the Insureds' condition, the EDX Defendants ignored Insureds' actual medical needs simply because such needs did not comport with the EDX Defendants' for-profit scheme.

246.     At bottom, the cookie-cutter approach to the NCV tests that the EDX Defendants purported to provide to Insureds clearly was not based on medical necessity. Instead, it was designed solely to maximize the charges that the EDX Defendants could submit to GEICO and other insurers, and to maximize their ill-gotten profits, without regard for genuine patient care.

### c.     The Fraudulent Charges for EMG Tests

247.     As part of their pre-determined fraudulent treatment and billing protocol, the EDX Defendants also purported to provide medically unnecessary EMGs to virtually all Insureds who received NCV tests.

248.     EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The electrical activity in each muscle tested is compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

249.     According to the Recommended Policy, the maximum number of EMGs necessary to diagnose a radiculopathy in 90 percent of all patients is EMGs of two limbs.

250.     The EDX Defendants purported to provide and/or perform EMGs to Insureds to determine whether the Insureds suffered from radiculopathies.  In actuality, the EMGs were provided – to the extent they were provided at all – as part of the EDX Defendants' pre-determined fraudulent treatment protocol designed to maximize the billing that they could submit for each Insured.

251.     There are many different muscles in the arms and legs that can be tested using EMGs.  The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances.  In a legitimate clinical setting, this decision is based upon

a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle.  As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

252.    As with their NCV tests, the EDX Defendants did not tailor the EMGs they purported to perform to the unique circumstances of each patient.  Instead, they routinely purported to test the same muscles in the same limbs over and over again, without regard for individual patients' presentation.

253.    Furthermore, even if there were any need for any of the EMGs, the nature and number of the EMGs that the EDX Defendants purported to provide and/or perform frequently grossly exceeded the maximum number of limbs tested – i.e., EMGs of two limbs – that are necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

254.    Nevertheless, the EDX Defendants routinely purported to provide and/or perform EMGs on all four limbs on the overwhelming majority of Insureds, in excess and contravention of the Recommended Policy, in order to maximize the fraudulent billing that they could submit or cause to be submitted to GEICO and other insurers, and solely to maximize the profits that they could reap from each Insured.

255.    The EDX Defendants typically billed for EMGs under CPT codes 98851, 98854, and 98856.  Pursuant to the Fee Schedule, EMG studies under CPT codes 98851, 98854, and 98856 are only reimbursable if the study is performed on at least five muscles in each limb tested.

256.    In that regard, many of the EDX Defendants' EMG studies were also medically unnecessary because the number of muscles tested per limb was insufficient for the EDX Defendants to render an accurate diagnosis and corroborate the billing of a "complete" single-limb

EMG study – i.e., the EDX Defendants' EMG studies often tested less than five muscles per limb. In particular, several of the four-limb EMG studies for which Queens Medical billed tested the Insureds' paraspinal muscles only.

257.    In keeping with the fact that the purported EMG tests were medically useless, the putative "results" of the EDX Defendants' EMG tests were not incorporated into any Insured's treatment plan and they played no genuine role in the treatment or care of the Insureds.

258.    In keeping with the fact that the EDX Defendants performed the Fraudulent Services pursuant to a fraudulent, predetermined treatment and billing protocol designed solely to maximize profit, the EDX Defendants always performed (or purported to perform) the EMG and NCV tests immediately following the initial examination or consultation.

259.    A proper neurological history and examination followed by a thoroughly conducted four-limb EMG and NCV test would require the EDX Defendants to spend at least two hours with each patient.  The fact that each of the patients purportedly subjected to the fraudulent EMG and NCV tests purportedly set aside two hours to receive a neurological examination and EMG and NCV tests indicates that either: (i) the patients knew in advance that they were to receive the EMG and NCV tests because the EMG and NCV tests are rendered pursuant to a *pre-determined* treatment protocol, or (ii) the EDX Defendants' EMG and NCV tests were not actually performed as billed.

**4.    The Fraudulent Charges for VNG Tests**

260.    Queens Medical also purported to subject many Insureds to medically unnecessary videonystagmography ("VNG") tests.

261.    The charges for the VNG tests were fraudulent in that the VNG tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the payments that were provided to the Clinics.

262.    The Defendants then billed the VNG tests through Queens Medical to GEICO, under CPT codes 92537, 92540, 92546, 92547, and 92548, generally resulting in charges of $815.37 for each VNG test that they purported to provide.

263.    In keeping with the fact that Queens Medical performed the VNG testing pursuant to a pre-determined treatment protocol, virtually every Insured who received VNG testing from Queens Medical also received TDT on the same date of service.

### a.      Legitimate Uses for VNG Tests

264.    VNG tests consist of tests that can be used to determine the cause of a patient's vertigo or balance disorder in cases where there are no readily recognizable contributing factors to the patient's condition.

265.    In other words, VNG tests are not used to confirm the existence of dizziness or balance disorder, but rather to identify the origin of the condition in the relatively rare cases where it cannot be determined through an ear, nose and throat ("ENT") or neurological medical examination. Generally, VNG tests are employed to determine the source of the generation of vertigo, i.e., the inner ear or brain.

266.    VNG tests should not be used as a first-line diagnostic procedure when a patient reports dizziness as the result of automobile accident trauma.  A legitimate diagnostic process for a patient reporting dizziness following an automobile accident should begin with a physical examination, including an ENT and neurological examination.

267.    VNG tests record involuntary eye movements, called nystagmus, using video imaging technology. The nystagmus is recorded and analyzed using sophisticated video goggles which are equipped with infrared video cameras.  The patient wears these goggles while being subjected to various stimuli, which duplicates the extraocular movement portion of the physical examination.

268.    There are four main components to VNG testing: (i) the saccade test, which evaluates rapid eye movements between fixation points; (ii) the tracking test, which evaluates movement of the eyes as they pursue a visual target; (iii) the positional test, which measures eye movements associated with positions of the head; and (iv) the caloric test, which measures responses to warm or cold water or air circulated through the ear canal. The cameras record the eye movements and display them on a video/computer screen. This allows the physician to see how the eyes move, which helps the physician assess the patient's balance, which in turn helps the physician assess the source of vertigo.

269.    To properly administer a VNG test, the patient must be prepared appropriately. This preparation typically requires 72 hours of abstention from medication (with the exception of heart, high blood pressure and anticonvulsant medications); 24 hours of abstention from stimulants such as caffeine, as well as alcohol; and three hours of food abstention. In addition, patients must be provided with a pre-test history and examination, to determine – among other things – the nature of the problematic symptoms and the patient's eye movements.

### b.    The Fraudulent VNG Test Charges

270.    Notwithstanding the need for pre-test preparation, the Insureds were referred to Queens Medical and received the VNG test on the initial visit with Queens Medical without receiving the appropriate pre-test preparation.

271.     Virtually none of the Insureds were referred to Queens Medical for VNG testing by an ENT doctor or any outside neurologist. In fact, the only neurologists who referred Queens Medical patients for VNG testing was Ahmed or a healthcare professional acting on behalf of Queens Medical immediately following an initial consultation.

272.     Furthermore, in most cases where Queens Medical purported to provide VNG tests, the Insureds did not report any unexplained dizziness as the result of an automobile accident.

273.     Indeed, many of the Insureds who received VNG testing from Queens Medical did not report experiencing dizziness, imbalance, or vertigo in the medical examination reports that preceded the VNG testing.

274.     For example,

(i)     On September 1, 2020, a patient named LA was purportedly involved in a motor vehicle accident. On September 1, 2020, LA underwent a medical examination at North Shore LIJ at which LA denied having dizziness or vertigo.   Similarly, on September 4, 2020, LA underwent a medical examination with Colin Clarke, MD at which LA reported no dizziness or vertigo.  Nevertheless, on September 11, 2020 LA underwent VNG testing with Queens Medical.

(ii)    On September 1, 2020, a patient named PA was purportedly involved in a motor vehicle accident. On September 1, 2020, PA underwent a medical examination at North Shore LIJ at which PA denied having dizziness or vertigo. Similarly, on September 4, 2020, PA underwent a medical examination with Colin Clarke, MD at which PA reported no dizziness or vertigo.  Nevertheless, on September 11, 2020 PA underwent VNG testing with Queens Medical.

(iii)   On June 27, 2020, a patient named GA was purportedly involved in a motor vehicle accident. On July 1, 2020, GA underwent a medical examination at Colin Clarke, MD at which GA reported no dizziness or vertigo. Nevertheless, on July 9, 2020 GA underwent VNG testing with Queens Medical.

(iv)    On December 5, 2020, a patient named ICA was purportedly involved in a motor vehicle accident. On January 8, 2021, ICA underwent a medical examination with Colin Clarke, MD at which ICA reported no dizziness or

vertigo. Nevertheless, on January 25, 2021 ICA underwent VNG testing with Queens Medical.

(vi)    On July 2, 2020, a patient named ZC was purportedly involved in a motor vehicle accident. On July 15, 2020, ZC underwent a medical examination with Colin Clarke, MD at which ZC reported no dizziness or vertigo. Nevertheless, on July 16, 2020 ZC underwent VNG testing with Queens Medical.

275.    Moreover, even if an Insured reported the existence of some general form of dizziness or balance disorder, the VNG tests supposedly provided by Queens Medical were medically unnecessary because the cause of the Insured's dizziness or imbalance could be identified through the physical examinations that Queens Medical routinely purported to provide and the patient histories that it purported to take during every initial consultation and follow-up examination.

276.    Because VNG tests properly are limited to circumstances in which the origin of a patient's vertigo is unclear, there is no legitimate reason to use VNG tests where – as in the case of every Insured who supposedly received VNG testing from Queens Medical – the dizziness supposedly was caused by an automobile accident.

277.    In keeping with the fact that the VNG tests that supposedly were provided by Queens Medical were medically unnecessary, no physician or healthcare provider associated with Queens Medical properly prepared the Insureds for the tests.  This, in turn, rendered the data that Queens Medical purported to obtain from the tests unreliable and useless.

278.    In keeping with the fact that Queens Medical's VNG tests were unreliable and useless, the data that Queens Medical purported to obtain from the tests was not incorporated into any Insured's treatment plan. In virtually every case in which the VNG tests returned a positive result the insured did not undergo any form of vestibular rehabilitation, balance retraining, or any other therapy to address their putative balance issues.

279.    As with the other Fraudulent Services, Queens Medical's VNG testing was part of Ahmed and the John Doe Defendants' fraudulent treatment and billing protocol and was designed solely to financially enrich Ahmed and the John Doe Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

### 5.    The Fraudulent Charges for Transcranial Doppler Testing

280.    Transcranial Doppler Testing ("TDT") is a noninvasive technique that uses sound waves to evaluate blood flow (blood circulation) in and around the brain.

281.    TDT typically uses a doppler transducer that enables recording of blood velocities from intracranial arteries through selected cranial foramina and thin regions of the skull.  Mapping of the sampled velocities as a color display of spectra locates the major brain arteries in three dimensions.

282.    TDT obtains information about the physiology of blood flow through the intracranial cerebrovascular system.

283.    Headaches, dizziness, and head trauma alone are not indications for TDT studies of the intracranial cerebrovascular system.

284.    Rather, TDT evaluation of the intracranial cerebrovascular system is generally used in connection with the following:

- Vasospasm, following a ruptured brain aneurysm;

- Sickle cell anemia, to determine a patient's risk of stroke;

- Ischemic stroke;

- Intracranial stenosis or blockage of the blood vessels;

- Cerebral microemboli; and/or

- Patent Foramen Ovale, a hole in the heart that doesn't close properly after birth, which may provoke embolic stroke.

285. Depending on the type of measurement needed, TDT studies can take at least 45 minutes, if not more.

286. In keeping with the fact that that the TDT was medically useless and performed on a protocol basis rather than to benefit any of the Insureds, in virtually every case where the Queens Medical purported to provide TDT, the Insureds did not suffer any sort of injury as the result of the automobile accident that would warrant the TDT.

287. As with the other Fraudulent Services, the TDT was part of Ahmed and the John Doe Defendants' fraudulent treatment and billing protocol and was designed solely to financially enrich Ahmed and the John Doe Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

**6.      The Fraudulent Charges for "Extracorporeal Shockwave Therapy"**

288. Ahmed also purported to subject many Insureds to medically unnecessary, experimental extracorporeal shockwave therapy ("ESWT") "treatments" that were performed through ECMC, Garden Medical, and Town Medical (the "ESWT Defendants").

289. The ESWT Defendants then billed GEICO for ESWT under CPT code 0101T, which is listed in the Fee Schedule as a "temporary code" identifying emerging and experimental technology. Temporary codes may become permanent codes or deleted during updates of the code set.

290. The ESWT Defendants' billing under CPT code 0101T generally resulted in charges of approximately $700.00 for each ESWT treatment that they purported to provide.

291.    The ESWT Defendants typically purported to provide two to three ESWT treatments per session, resulting in charges of approximately $1400.00 to $2100.00 per date of service.

292.    Further, the ESWT Defendants typically charged GEICO for two to four sessions of ESWT per Insured, resulting in charges ranging from approximately $2,800.00 to $8,400.00 per Insured, with charges occasionally exceeding $10,000.00 per Insured.

293.    Pursuant to the Fee Schedule, CPT code 0101T applies to "extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy."

294.    ESWT is a nonsurgical treatment that involves the delivery of shock waves to musculoskeletal areas of the body with the purported goal of reducing pain and promoting the healing of affected soft tissue.

295.    During ESWT treatment, the practitioner moves an applicator over a gel-covered treatment area.  As the applicator is moved over the treatment area, high energy shock waves that allegedly stimulate the metabolism, enhance blood circulation, and accelerate the healing process are released into the treatment area.

296.    Typically, Defendants purported to perform ESWT treatments on Insureds purportedly experiencing musculoskeletal pain, including back, shoulder, and/or neck pain.

297.    In a legitimate clinical setting, treatment for neck, back, or shoulder pain should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

298.    If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment

and the use of prescription pain management medication.  These clinical approaches are well-established.

299.   By contrast, the use of ESWT for the treatment of back, neck, and shoulder pain is experimental and investigational.

300.   In keeping with the fact that ESWT for the treatment of back, neck, and shoulder pain is not a legitimate treatment option, ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain.

301.   In addition, the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it not reasonable and necessary for the treatment of musculoskeletal conditions and therefore not covered.

302.   What is more, there are no legitimate peer reviewed data that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain.

303.   In keeping with the fact that ESWT for the treatment of musculoskeletal conditions is not a legitimate treatment option: (i) Aetna insurance company considers ESWT experimental and investigational for the treatment of low back pain, lower limb conditions, and other musculoskeletal indications and, as such, does not cover it; (ii) UnitedHealth Group Incorporated care does not cover ESWT for the treatment of musculoskeletal or soft tissue indications due to insufficient evidence of its efficacy in those applications; (iii) the Blue Cross Blue Shield Association does not cover ESWT for the treatment of musculoskeletal conditions because it is considered investigational; and (iv) Cigna considers ESWT experimental, investigational, or

unproven for any indication, including the treatment of musculoskeletal conditions and soft tissue wounds, and therefore does not cover it.

304.  As with the other Fraudulent Services, the billing for ESWT treatments was part of Ahmed and the John Doe Defendants' fraudulent treatment and billing protocol and was designed solely to financially enrich Ahmed and the John Doe Defendants, rather than to benefit any of the Insureds who supposedly were subjected to such treatments.

305.  The charges for the medically unnecessary ESWT also were fraudulent in that the Defendants did not even actually provide ESWT that satisfied the requirements of CPT code 0101T.

306.  Instead, the Defendants actually provided Radial Pressure Wave Therapy.

307.  Contrary to the CPT Code 0101T, which is reserved for "high energy" "shock wave" therapy," Radial Pressure Wave Therapy involves the low energy delivery of compressed air and is incapable of generating a true shock wave.

308.  Radial Pressure Wave Therapy does not satisfy the requirements of CPT code 0101T.

309.  In fact, the ESWT Defendants utilized a portable, compact radial wave pressure device that does not even purport to be able to provide the high-energy capacity necessary to produce a true shock wave.

310.  Accordingly, even if the ESWT was approved for, or had any documented effectiveness for, the treatment of back, neck, and shoulder pain – which it does not – the ESWT rendered by the ESWT Defendants did not provide high-energy ESWT treatments, but merely a form of pressure wave therapy that the ESWT Defendants fraudulently billed for under CPT code 0101T.

311.   Even if the Defendants had provided treatment that was reimbursable under CPT code 0101T, such treatment would have been medically unnecessary and was performed—to the extent that it was performed at all—pursuant to the Defendants' fraudulent treatment and billing protocol.

312.   In keeping with the fact that the ESWT Defendants rendered the ESWT "treatments" pursuant to a fraudulent pre-determined treated protocol, the "treatments" the ESWT Defendants allegedly performed were not tailored to any individual Insured's particular circumstances.

313.   According to the documentation submitted by the ESWT Defendants, the Radial Pressure Wave Therapy machines they used had a range of pressure intensity, pulse, and frequency settings.  These settings ostensibly exist so that the treatment can be tailored to the needs of each individual patient.

314.   Yet, the "Treatment Plan" form that the ESWT Defendants submitted for virtually every Insured recommended "3-4 times" as the number of treatment sessions and represented that the treatments were performed with the exact same settings for virtually every Insured: (i) pressure intensity of "1.0-1.1"; (ii) "2000" pulses; and (iii) at a frequency of "16" hertz.

315.   By way of example, the following is an excerpt of a "Treatment Plan" form that ECMC submitted, which is representative of virtually every "Treatment Plan" form it submitted to GEICO:

**Requested Frequency**

0-1 times          1-2 times          2-3 times          3-4 times          4-5 times

**PROCEDURES and PARAMETERS (technician use)**
☐ Pressure Intensity ___*1-0 - 11*___ BAR (1.0 to 10)
☐ Pulses ___*2000*___ (500 to 3000)
☐ Frequency ___*10*___ Hz (3 to 16)
☐ Type of Transmitter _____ (Red R40) _____(Black D20) _____(Other)

316.     By way of further example, the following is a "Treatment Plan" form submitted by Garden Medical, which is representative of virtually every "Treatment Plan" form it submitted to GEICO:

**Requested Frequency**

0-1 times          1-2 times          2-3 times          3-4 times          4-5 times

**PROCEDURES and PARAMETERS (technician use)**
☐ Pressure Intensity ___*1.0 - 11*___ BAR (1.0 to 10)
☐ Pulses ___*2000*___ (500 to 3000)
☐ Frequency ___*16*___ Hz (3 to 16)
☐ Type of Transmitter _____ (Red R40) _____ (Black D20) _____(Other)

317.     By way of further example, the following is a "Treatment Plan" form submitted by Town Medical, which is representative of virtually every "Treatment Plan" form it submitted to GEICO:

Requested Frequency

0-1 times        1-2 times        2-3 times        3-4 times        4-5 times

PROCEDURES and PARAMETERS (technician use)
☐ Pressure Intensity ___1.0 - 1.1___ BAR (1.0 to 10)
☐ Pulses ___2,000___ (500 to 3000)
☐ Frequency ___10___ Hz (3 to 16)
☐ Type of Transmitter _____ (Red R40) __X__ (Black D20) _____ (Other)

318.    In further keeping with the fact that the ESWT treatments were provided pursuant to a pre-determined treatment protocol and without regard to the needs of the individual Insureds, the ESWT Defendants respective initial examination and consultation reports included boilerplate language for every Insured stating that "there is no other conservative medical intervention, other than RPW [Radial Pressure Wave Therapy] at this point in time to correct mal-alignments, joint stiffness, subluxate, fibrous adhesions, and/or calcifications."

319.    However, in many cases, the ESWT Defendants purported to provide ESWT treatments to Insureds soon after their accident and without giving them the opportunity to sufficiently respond to any course of conservative treatment.

320.    In fact, the ESWT Defendants subjected dozens of Insureds to experimental and investigational ESWT treatments less than 20 days after their accidents.

321.    For example:

(i)     ECMC purported to provide ESWT to an Insured named ML on January 7, 2021, only three days after ML's accident on January 4, 2021.

(ii)    ECMC purported to provide ESWT to an Insured named AR on October 23,2020, only four days after AR's accident on October 19, 2020.

(iii)   ECMC purported to provide ESWT to an Insured named SHP on January 26, 2021, only six days after SHP's accident on January 20, 2021.

(iv)    ECMC purported to provide ESWT to an Insured named LF on December 2, 2020, only seven days after LF's accident on November 25, 2020.

(v)     ECMC purported to provide ESWT to an Insured named SR on October 12, 2020, only eight days after SR's accident on October 4, 2020.

(vi)    Garden Medical purported to provide ESWT to an Insured named MC on May 25, 2021, only eleven days after MC's accident on May 14, 2021.

(vii)   Garden Medical purported to provide ESWT to an Insured named MDV on May 25, 2021, only 11 days after MDV's accident on May 14, 2021.

(viii)  Garden Medical purported to provide ESWT to an Insured named WA on May 17, 2021, only sixteen days after WA's accident on May 1, 2021.

(ix)    Garden Medical purported to provide ESWT to an Insured named GR on May 17, 2021, only sixteen days after GR's accident on May 1, 2021.

(x)     Garden Medical purported to provide ESWT to an Insured named LP on June 1, 2021, only seventeen days after LP's accident on May 15, 2021.

(xi)    Town Medical purported to provide ESWT to an Insured named YB on April 30, 2021, only three days after YB's accident on April 27, 2021.

(xii)   Town Medical purported to provide ESWT to an Insured named LQ on May 12, 2021, only three days after LQ's accident on May 9, 2021.

(xiii)  Town Medical purported to provide ESWT to an Insured named WM on February 24, 2021, only four days after WM's accident on February 20, 2021.

(xiv)   Town Medical purported to provide ESWT to an Insured named AG on April 28, 2021, only four days after AG's accident on April 24, 2021.

(xv)    Town Medical purported to provide ESWT to an Insured named YA on March 17, 2021, only five days after YA's accident on March 12, 2021.

322.    These are only examples.  In many of the claims identified in Exhibits "3" through "5," the ESWT Defendants falsely represented that the Insured had received the experimental and investigational ESWT only because "there is no other conservative medical intervention, other than RPW [Radial Pressure Wave Therapy] at this point in time to correct mal-alignments, joint stiffness, subluxate, fibrous adhesions, and/or calcifications."

323.    Further evincing that the ESWT Defendants provided ESWT treatment in order to maximize profit pursuant to a predetermined treatment protocol, the ESWT Defendants routinely provided the same number of treatment sessions of ESWT to multiple Insureds involved in the same accident at or about the same time.

324.    For example:

(i)      Two Insureds — MN and NN – were involved in the same automobile accident on October 12, 2020.   Thereafter, ECMC purported to render six sessions of experimental EWST to both Insureds.

(ii)     Three insureds — AL, JM, and AS – were involved in the same automobile accident on October 19, 2020.  Thereafter, ECMC purported to render experimental ESWT to all three Insureds, with AS receiving three sessions and AL and JM receiving two sessions.

(iii)    Two Insureds — AVA and JB – were involved in the same automobile accident on June 27, 2020.  Thereafter, ECMC purported to render two sessions of experimental EWST to both Insureds.

(iv)     Two Insureds — FT and RT – were involved in the same automobile accident on August 20, 2020.   Thereafter, ECMC purported to render five sessions of experimental EWST to both Insureds.

(v)      Two Insureds — EA and LM – were involved in the same automobile accident on September 20, 2020.   Thereafter, ECMC purported to render two sessions of experimental EWST to both Insureds.

(vi)     Two Insureds — GR and JR – were involved in the same automobile accident on May 18, 2021.  Thereafter, Garden Medical purported to render four sessions of experimental EWST to both Insureds.

(vii)    Two Insureds — MC and MDV – were involved in the same automobile accident on May 14, 2021.  Thereafter, Garden Medical purported to render six sessions of experimental EWST to both Insureds.

(viii)   Two Insureds — CC and IHR – were involved in the same automobile accident on April 19, 2021.  Thereafter, Garden Medical purported to render four sessions of experimental EWST to both Insureds.

(ix)     Two Insureds — MD and JRD – were involved in the same automobile accident on November 27, 2020.  Thereafter, Garden Medical purported to render three sessions of experimental EWST to both Insureds.

(x)   Two Insureds — CDC and MG – were involved in the same automobile accident on April 19, 2021.  Thereafter, Garden Medical purported to render three sessions of experimental EWST to both Insureds.

(xi)   Two Insureds — GE and KE – were involved in the same automobile accident on September 17, 2020.  Thereafter, Town Medical purported to render five sessions of experimental EWST to both Insureds.

(xii)   Two Insureds — MR and NR – were involved in the same automobile accident on February 15, 2021.  Thereafter, Town Medical purported to render three sessions of experimental EWST to both Insureds.

(xiii)   Three Insureds — ACG, JM, and AP – were involved in the same automobile accident on February 6, 2021.  Thereafter, Town Medical purported to render experimental ESWT to all three Insureds, with ACG and JM receiving five sessions and AP receiving three sessions.

(xiv)   Three Insureds — EC, DG, and MG – were involved in the same automobile accident on April 13, 2021.  Thereafter, Town Medical purported to render two sessions of experimental EWST to all three Insureds.

(xv)   Three Insureds — ABC, MC, and VD – were involved in the same automobile accident on March 12, 2021.  Thereafter, Town Medical purported to render experimental ESWT to all three Insureds, with ABC receiving three sessions and MC and VD receiving two sessions.

325.   It is improbable that two or more Insureds involved in any single motor vehicle accident would suffer substantially similar injuries or exhibit substantially similar symptomatology that would require a virtually identical number of experimental ESWT treatments, to the extent ESWT was even medically necessary.

326.   As with the other Fraudulent Services, the ESWT Defendants' billing for ESWT was part of the Ahmed and the John Doe Defendants' fraudulent treatment and billing protocol, and was designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

**D.**   **The Fraudulent Billing for Independent Contractor Services**

327.    The Defendants' fraudulent scheme also included the submission of claims to GEICO on behalf of the PC Defendants seeking payment for services provided by independent contractors.

328.    Under the New York no-fault insurance laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

329.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS).

330. The PC Defendants routinely submitted charges to GEICO and other insurers for Fraudulent Services that purportedly were performed by healthcare professionals and/or technicians other than Ahmed or the PC Defendants' employees.

331. The healthcare professionals and/or technicians working under the names of the PC Defendants set their own work schedules or had their schedules set for them by the John Doe Defendants.

332. The healthcare professionals and/or technicians working under the names of the PC Defendants worked without any supervision by Ahmed or Gelb.

333. The healthcare professionals and/or technicians working under the names of the PC Defendants did not exclusively provide services for the PC Defendants.

334. For example:

(i) A health care professional who purportedly provided healthcare services on behalf of ENS Medical from June 2018 through September 2018 also purportedly provided healthcare services through eleven additional medical providers, who also submitted billing to GEICO, during this time. What is more, this healthcare professional often allegedly rendered services on behalf of up to four different medical providers on the same date of service during this time.

(ii) A health care professional who purportedly provided healthcare services interchangeably through ENS Medical, Queens Medical, and/or Atlantic Medical from June 2018 through at least April 2021 also purportedly provided healthcare services through eleven additional medical providers, who also submitted billing to GEICO, during this time. What is more, this healthcare professional often allegedly rendered services on behalf of two different medical providers on the same date of service during this time.

(iii) A healthcare professional who purportedly provided healthcare services through ENS Medical from September 2018 through February 2019 and through Atlantic Medical from October 2019 through December 2020 also purportedly provided healthcare services through seven additional medical providers, who also submitted billing to GEICO, during this time.

335. To the extent that they were performed in the first instance, all of the Fraudulent Services performed by healthcare services providers other than Ahmed were performed by

healthcare professionals and/or technicians whom the Defendants treated as independent contractors.

336.    For instance, the Defendants:

(i)      paid the health care professionals and/or technicians, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii)     established an understanding with the health care professionals and/or technicians that they were independent contractors, rather than employees;

(iii)    paid no employee benefits to the health care professionals and/or technicians;

(iv)     failed to secure and maintain W-4 or I-9 forms for the health care professionals and/or technicians;

(v)      failed to withhold federal, state, or city taxes on behalf of the health care professionals and/or technicians;

(vi)     compelled the health care professionals to pay for their own malpractice insurance at their own expense;

(vii)    permitted the health care professionals and/or technicians to set their own schedules and days on which they desired to perform services;

(viii)   permitted the health care professionals and/or technicians to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other practices; and

(ix)     failed to cover the health care professionals and/or technicians for either unemployment or workers' compensation benefits; and

(x)      "filed corporate and payroll tax returns (e.g., Internal Revenue Service ("IRS") forms 1120 and 941 and New York State NYS-45 WEB Forms) that did not report: (i) all of the monies they paid for the services of the healthcare professionals and/or technicians; and/or (ii) the identity of each healthcare professional and/or technician who performed the Fraudulent Services, to the extent Defendants included a list of "employees" with their filings.

337.    By electing to treat the healthcare professionals as independent contractors, the Defendants realized significant economic benefits – for instance:

     (i)       avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

     (ii)      avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

     (iii)     avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

     (iv)     avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

     (v)      avoiding the need to secure any malpractice insurance; and

     (vi)     avoiding claims of agency-based liability arising from work performed by the health care professionals.

338. Because the health care professionals and/or technicians were independent contractors and performed the Fraudulent Services, the PC Defendants never had any right to bill or collect PIP Benefits in connection with those services.

339. Ahmed and the PC Defendants billed for the Fraudulent Services as if they were provided by Ahmed, Gelb, or actual employees of the PC Defendants to make it appear as if the services were eligible for reimbursement.

340. Ahmed and the PC Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

341. Ahmed and the PC Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

**E.    Queens Medical, ECMC, Garden Medical, and Town Medical's Fraudulent Billing for Services Rendered by Unsupervised Physician Assistants**

342.    Pursuant to Education Law § 6542(1), a physician assistant may perform medical services but only when under the supervision of a licensed physician. The physician's supervision must be "continuous" pursuant to Education Law § 6542(2).

343.    Pursuant to 10 N.Y.C.R.R. § 94.2, "[a] physician supervising or employing a licensed physician assistant or registered specialist assistant shall remain medically responsible for the medical services performed by the licensed physician assistant or registered specialist assistant whom such physician supervises or employs."

344.    Queens Medical, ECMC, Garden Medical, and Town Medical (the "Unsupervised Services Defendants") hired physician assistants ("PAs"), who allegedly performed many of the Fraudulent Services on behalf of the Unsupervised Services Defendants. The PAs purported to perform the Fraudulent Services at the Clinics, and the Fraudulent Services were then billed through the Unsupervised Services Defendants to GEICO under New York no-fault insurance policies.

345.    However, the PAs hired by the Unsupervised Services Defendants were not supervised by any licensed physician or other healthcare professional, including Ahmed or Gelb, when they purported to perform the Fraudulent Services in the claims identified in Exhibits "2" through "5." To the contrary, there typically was not even a licensed physician present at any of the Clinics when the PAs would purport to perform the Fraudulent Services on behalf of the Unsupervised Services Defendants.

346.    In the claims identified in Exhibits "2" through "5," all of the Unsupervised Services Defendants' billing for the Fraudulent Services that the PAs purported to perform misrepresented that the underlying services were lawfully performed and were eligible for reimbursement, when in fact they were not.

347.     In an effort to conceal the fraudulent billing for services rendered by unsupervised PAs, the bills submitted by the Unsupervised Services Defendants virtually never included the names of the PAs that actually rendered the Fraudulent Services, but instead listed only Ahmed or Gelb as the physician or "treating provider."

**III.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

348.     To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3, HCFA-1500 forms, and/or treatment reports through the PC Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

349.     The NF-3, HCFA-1500 forms, and/or treatment reports submitted to GEICO by and on behalf of Defendants were false and misleading in the following material respects:

(i)      The NF-3, HCFA-1500 forms and supporting documentation submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary.  In fact, the Fraudulent Services, to the extent provided at all, were not medically necessary and were provided pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds;

(ii)     The NF-3, HCFA-1500 forms and supporting documentation submitted to GEICO by and on behalf of Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others.

(iv)     With the exception of NF-3 forms, HCFA-1500 forms, and treatment reports covering services actually performed by Ahmed, the NF-3 forms, HCFA-1500 forms, and treatment reports submitted by, and on behalf of, the Defendants uniformly misrepresented to GEICO that the Defendants were eligible to receive PIP Benefits pursuant to Insurance Law §

5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed.  In fact, the Defendants were not eligible to seek or pursue collection of PIP Benefits for the services that supposedly were performed because the services were: (i) provided by independent contractors, to the extent they were provided at all; and/or (ii) provided by unsupervised physician assistants.

## IV.    Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

350.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

351.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

352.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the PC Defendants in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

353.    Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

354.    Furthermore, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed – to the extent they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

355.    In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the health care professionals associated with the PC Defendants in

order to prevent GEICO from discovering that the health care professionals performing many of the Fraudulent Services were not employed by the PC Defendants.

356.    Furthermore, in many cases, Defendants knowingly misrepresented that Ahmed or Gelb was the treating provider who rendered the Fraudulent Services, when, in fact, Defendants concealed that PAs were performing the Fraudulent Services as well as facts demonstrating that the PAs were not being supervised by Ahmed, Gelb, or any other physician with respect to the performance of the Fraudulent Services in order to prevent GEICO from discovering that the Defendants violated material licensing laws.

357.    What is more, the Defendants billed for the Fraudulent Services through multiple individuals and entities using multiple tax identification numbers in order to reduce the amount of billing submitted through any single individual or entity or under any single tax identification number, thereby preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity.

358.    Defendants also hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

359.    The Defendants' collection efforts through numerous separate no-fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

360.    In addition, Ahmed and the John Doe Defendants sought to conceal Town Medical's relationship to the fraudulent scheme by misrepresenting on its billing that Gelb was the owner of Town Medical when, in fact, Town Medical is owned, controlled, and operated by Ahmed.

361.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to, and did, cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $2,293,000.00 based upon the fraudulent charges.

362.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against all Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

363.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

364.    There is an actual case in controversy between GEICO and the PC Defendants regarding more than $5,609,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO.

365.    Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely

to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

366. Defendants have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services – to the extent that they were provided at all – misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

367. Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to the dictates of laypersons not licensed to render healthcare services.

368. Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback payments made in exchange for patient referrals.

369. Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of the PC Defendants.

370. Ahmed, Gelb, Queens Medical, ECMC, Garden Medical, and Town Medical have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – by unsupervised PAs, in violation of material licensing laws.

371. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the PC Defendants.

## SECOND CAUSE OF ACTION
### Against Ahmed
### (Violation of RICO, 18 U.S.C. § 1962(c))

372.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

373.    ENS Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

374.    Ahmed knowingly has conducted and/or participated, directly or indirectly, in the conduct of ENS Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that ENS Medical was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) ENS Medical obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by ENS Medical's employees.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1."

375.    ENS Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the

regular ways in which Ahmed operated ENS Medical, inasmuch as ENS Medical never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for ENS Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through ENS Medical to the present day.

376. ENS Medical is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by ENS Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

377. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $200,000.00 pursuant to the fraudulent bills submitted by the Defendants through ENS Medical.

378. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Ahmed and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

379. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

380. ENS Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

381. Ahmed and John Doe Defendants are employed by and/or associated with the DEO

enterprise.

382.     Ahmed and John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of ENS Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that ENS Medical was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) ENS Medical obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by ENS Medical's employees.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1."

383.     Ahmed and John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

384.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $200,000.00 pursuant to the fraudulent bills submitted

by Defendants through ENS Medical.

385.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Ahmed and ENS Medical**
**(Common Law Fraud)**

386.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

387.     Ahmed and ENS Medical intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

388.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that ENS Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich ENS Medical and Ahmed; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the

representation that the billed-for services were provided by employees of ENS Medical, when in fact many of the billed-for services were provided by independent contractors.

389.    Ahmed and ENS Medical intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through ENS Medical that were not compensable under the No-Fault Laws.

390.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $200,000.00 pursuant to the fraudulent bills submitted by Defendants through ENS Medical.

391.    Ahmed and ENS Medical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

392.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against Ahmed and ENS Medical**
**(Unjust Enrichment)**

393.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

394.    As set forth above, Ahmed and ENS Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

395.    When GEICO paid the bills and charges submitted by or on behalf of ENS Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

396.    Ahmed and ENS Medical have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

397.    Ahmed and ENS Medical's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

398.    By reason of the above, Ahmed and ENS Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than $200,000.00.

**SIXTH CAUSE OF ACTION**
**Against John Doe Defendants**
**(Aiding and Abetting Fraud)**

399.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

400.    John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Ahmed and ENS Medical.

401.    The acts of John Doe Defendants in furtherance of the fraudulent scheme included, among other things, assisting with the operation of ENS Medical, knowingly referring Insureds to ENS Medical in exchange for illegal kickbacks from Ahmed and ENS Medical, and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

402.    The conduct of John Doe Defendants in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Ahmed or ENS Medical to obtain referrals of patients at the Clinics, subject those

patients to medically unnecessary services, and obtain payment from GEICO and other insurers for the Fraudulent Services.

403. John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Ahmed and ENS Medical for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

404. The conduct of John Doe Defendants caused GEICO to pay more than $200,000.00 pursuant to the fraudulent bills submitted through ENS Medical.

405. This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

406. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against Ahmed**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

407. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

408. Queens Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

409. Ahmed knowingly has conducted and/or participated, directly or indirectly, in the conduct of Queens Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for

over two years seeking payments that Queens Medical was not eligible to receive under the No-Fault

Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services

were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol

designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented

and exaggerated the level of services that purportedly were provided in order to inflate the charges

that could be submitted; (iv) Queens Medical obtained its patients through the Defendants' illegal

kickback scheme; (v) in many cases, the billed-for services were provided – to the extent they were

provided at all – by independent contractors, rather than by Queens Medical's employees; and (vi)

in many cases, the billed-for services were provided – to the extent they were provided at all – by

unsupervised PAs, in violation of material licensing laws. The fraudulent billings and

corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering

activity identified through the date of this Complaint are described in the chart annexed hereto as

Exhibit "2."

410.    Queens Medical's business is racketeering activity, inasmuch as the enterprise exists

for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the

regular ways in which Ahmed operated Queens Medical, inasmuch as Queens Medical never was

eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order

for Queens Medical to function. Furthermore, the intricate planning required to carry out and conceal

the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that

Defendants continue to attempt collection on the fraudulent billing submitted through Queens

Medical to the present day.

411.    Queens Medical is engaged in inherently unlawful acts inasmuch as it continues to

attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently

unlawful acts are taken by Queens Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

412.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $742,000.00 pursuant to the fraudulent bills submitted by the Defendants through Queens Medical.

413.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Ahmed and John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

414.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

415.     Queens Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

416.     Ahmed and John Doe Defendants are employed by and/or associated with the Queens Medical enterprise.

417.     Ahmed and John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Queens Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Queens Medical was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely

to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Queens Medical obtained its patients through the Defendants' illegal kickback scheme; (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Queens Medical's employees; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by unsupervised PAs, in violation of material licensing laws.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2."

418.     Ahmed and John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

419.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $742,000.00 pursuant to the fraudulent bills submitted by Defendants through Queens Medical.

420.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
### Against Ahmed and Queens Medical
### (Common Law Fraud)

421.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

422.     Ahmed and Queens Medical intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

423.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Queens Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Queens Medical and Ahmed; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; (iv) in every claim, the representation that the billed-for services were provided by employees of Queens Medical, when in fact many of the billed-for services were provided by independent contractors; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by unsupervised PAs, in violation of material licensing laws.

424.     Ahmed and Queens Medical intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Queens Medical that were not compensable under the No-Fault Laws.

425.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $742,000.00 pursuant to the fraudulent bills submitted by Defendants through Queens Medical.

426.     Ahmed and Queens Medical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

427.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TENTH CAUSE OF ACTION
### Against Ahmed and Queens Medical
### (Unjust Enrichment)

428.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

429.     As set forth above, Ahmed and Queens Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

430.     When GEICO paid the bills and charges submitted by or on behalf of Queens Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

431.     Ahmed and Queens Medical have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Ahmed and Queens Medical voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

432.     Ahmed and Queens Medical's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

433.    By reason of the above, Ahmed and Queens Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than $742,000.00.

## ELEVENTH CAUSE OF ACTION
### Against John Doe Defendants
### (Aiding and Abetting Fraud)

434.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

435.    John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Ahmed and Queens Medical.

436.    The acts of John Doe Defendants in furtherance of the fraudulent scheme included, among other things, assisting with the operation of Queens Medical, knowingly referring Insureds to Queens Medical in exchange for illegal kickbacks from Ahmed and Queens Medical, and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

437.    The conduct of John Doe Defendants in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Ahmed or Queens Medical to obtain referrals of patients at the Clinics, subject those patients to medically unnecessary services, and obtain payment from GEICO and other insurers for the Fraudulent Services.

438.    John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Ahmed and Queens Medical for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

439.     The conduct of John Doe Defendants caused GEICO to pay more than $742,000.00 pursuant to the fraudulent bills submitted through Queens Medical.

440.     This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

441.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWELFTH CAUSE OF ACTION**
**Against Ahmed**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

442.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

443.     ECMC is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

444.     Ahmed knowingly has conducted and/or participated, directly or indirectly, in the conduct of ECMC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that ECMC was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) ECMC obtained its patients through the Defendants' illegal kickback

scheme; (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by ECMC's employees; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by unsupervised PAs, in violation of material licensing laws. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3."

445.    ECMC's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Ahmed operated ECMC, inasmuch as ECMC never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for ECMC to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through ECMC to the present day.

446.    ECMC is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by ECMC in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

447.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $751,000.00 pursuant to the fraudulent bills submitted by the Defendants through ECMC.

448.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THIRTEENTH CAUSE OF ACTION**
**Against Ahmed and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

449.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

450.    ECMC is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

451.    Ahmed and John Doe Defendants are employed by and/or associated with the ECMC enterprise.

452.    Ahmed and John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of ECMC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that ECMC was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) ECMC obtained its patients through the Defendants' illegal kickback scheme; (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by ECMC's employees; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by unsupervised PAs, in violation of material licensing laws.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise

the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3."

453.    Ahmed and John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

454.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $751,000.00 pursuant to the fraudulent bills submitted by Defendants through ECMC.

455.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FOURTEENTH CAUSE OF ACTION
**Against Ahmed and ECMC**
**(Common Law Fraud)**

456.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

457.    Ahmed and ECMC intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

458.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that ECMC was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and

were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich ECMC and Ahmed; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; (iv) in every claim, the representation that the billed-for services were provided by employees of ECMC, when in fact many of the billed-for services were provided by independent contractors; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by unsupervised PAs, in violation of material licensing laws.

459.    Ahmed and ECMC intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through ECMC that were not compensable under the No-Fault Laws.

460.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $751,000.00 pursuant to the fraudulent bills submitted by Defendants through ECMC.

461.    Ahmed and ECMC's extensive fraudulent conduct demonstrate a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

462.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against Ahmed and ECMC
### (Unjust Enrichment)

463.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

464.    As set forth above, Ahmed and ECMC have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

465.    When GEICO paid the bills and charges submitted by or on behalf of ECMC for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

466.    Ahmed and ECMC have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Ahmed and ECMC voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

467.    Ahmed and ECMC's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

468.    By reason of the above, Ahmed and ECMC have been unjustly enriched in an amount to be determined at trial, but in no event less than $751,000.00.

## SIXTEENTH CAUSE OF ACTION
### Against John Doe Defendants
### (Aiding and Abetting Fraud)

469.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

470.    John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Ahmed and ECMC.

471.    The acts of John Doe Defendants in furtherance of the fraudulent scheme included, among other things, assisting with the operation of ECMC, knowingly referring Insureds to ECMC in exchange for illegal kickbacks from Ahmed and ECMC, and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

472.    The conduct of John Doe Defendants in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Ahmed or ECMC to obtain referrals of patients at the Clinics, subject those patients to medically unnecessary services, and obtain payment from GEICO and other insurers for the Fraudulent Services.

473.    John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Ahmed and ECMC for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

474.    The conduct of John Doe Defendants caused GEICO to pay more than $751,000.00 pursuant to the fraudulent bills submitted through ECMC.

475.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

476.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTEENTH CAUSE OF ACTION
### Against Ahmed
### (Violation of RICO, 18 U.S.C. § 1962(c))

477.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

478.    Garden Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

479.    Ahmed knowingly has conducted and/or participated, directly or indirectly, in the conduct of Garden Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Garden Medical was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Garden Medical obtained its patients through the Defendants' illegal kickback scheme; (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Garden Medical's employees; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by unsupervised PAs, in violation of material licensing laws. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "4."

480.     Garden Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Ahmed operated Garden Medical, inasmuch as Garden Medical never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for Garden Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Garden Medical to the present day.

481.     Garden Medical is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Garden Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

482.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $141,000.00 pursuant to the fraudulent bills submitted by the Defendants through Garden Medical.

483.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### EIGHTEENTH CAUSE OF ACTION
**Against Ahmed and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

484.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

485.     Garden Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

486.     Ahmed and John Doe Defendants are employed by and/or associated with the Garden Medical enterprise.

487.     Ahmed and John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Garden Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Garden Medical was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Garden Medical obtained its patients through the Defendants' illegal kickback scheme; (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Garden Medical's employees; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by unsupervised PAs, in violation of material licensing laws.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "4."

488.     Ahmed and John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

489.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $141,000.00 pursuant to the fraudulent bills submitted by Defendants through Garden Medical.

490.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### NINETEENTH CAUSE OF ACTION
**Against Ahmed and Garden Medical**
**(Common Law Fraud)**

491.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

492.     Ahmed and Garden Medical intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

493.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Garden Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Garden Medical and Ahmed; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; (iv) in every claim, the

representation that the billed-for services were provided by employees of Garden Medical, when in fact many of the billed-for services were provided by independent contractors; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by unsupervised PAs, in violation of material licensing laws.

494.    Ahmed and Garden Medical intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Garden Medical that were not compensable under the No-Fault Laws.

495.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $141,000.00 pursuant to the fraudulent bills submitted by Defendants through Garden Medical.

496.    Ahmed and Garden Medical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

497.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTIETH CAUSE OF ACTION**
**Against Ahmed and Garden Medical**
**(Unjust Enrichment)**

498.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

499.    As set forth above, Ahmed and Garden Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

500.     When GEICO paid the bills and charges submitted by or on behalf of Garden Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

501.     Ahmed and Garden Medical have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Ahmed and Garden Medical voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

502.     Ahmed and Garden Medical's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

503.     By reason of the above, Ahmed and Garden Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than $141,000.00.

## TWENTY-FIRST CAUSE OF ACTION
### Against John Doe Defendants
### (Aiding and Abetting Fraud)

504.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

505.     John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Ahmed and Garden Medical.

506.     The acts of John Doe Defendants in furtherance of the fraudulent scheme included, among other things, assisting with the operation of Garden Medical, knowingly referring Insureds to Garden Medical in exchange for illegal kickbacks from Ahmed, and Garden Medical and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

507.     The conduct of John Doe Defendants in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants was a necessary part of and was

critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Ahmed or Garden Medical to obtain referrals of patients at the Clinics, subject those patients to medically unnecessary services, and obtain payment from GEICO and other insurers for the Fraudulent Services.

508.    John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Ahmed and Garden Medical for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

509.    The conduct of John Doe Defendants caused GEICO to pay more than $141,000.00 pursuant to the fraudulent bills submitted through Garden Medical.

510.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

511.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTY-SECOND CAUSE OF ACTION**
**Against Ahmed**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

512.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

513.    Town Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

514.    Ahmed knowingly has conducted and/or participated, directly or indirectly, in the conduct of Town Medical's affairs through a pattern of racketeering activity consisting of repeated

violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Town Medical was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Town Medical obtained its patients through the Defendants' illegal kickback scheme; (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Town Medical's employees; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by unsupervised PAs, in violation of material licensing laws. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "5."

515.    Town Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Ahmed operated Town Medical, inasmuch as Town Medical never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for Town Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Town Medical to the present day.

516.    Town Medical is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Town Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

517.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $188,000.00 pursuant to the fraudulent bills submitted by the Defendants through Town Medical.

518.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWENTY-THIRD CAUSE OF ACTION
**Against Ahmed, Gelb, and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

519.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

520.    Town Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

521.    Ahmed, Gelb, and John Doe Defendants are employed by and/or associated with the Town Medical enterprise.

522.    Ahmed, Gelb, and John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Town Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Town Medical was not eligible to receive under the No-Fault Laws because: (i) the

billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Town Medical obtained its patients through the Defendants' illegal kickback scheme; (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Town Medical's employees; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by unsupervised PAs, in violation of material licensing laws.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "5."

523.    Ahmed, Gelb, and John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

524.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $188,000.00 pursuant to the fraudulent bills submitted by Defendants through Town Medical.

525.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWENTY-FOURTH CAUSE OF ACTION**
**Against Ahmed and Town Medical**
**(Common Law Fraud)**

526.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

527.    Ahmed and Town Medical intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

528.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Town Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Town Medical and Ahmed; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; (iv) in every claim, the representation that the billed-for services were provided by employees of Town Medical, when in fact many of the billed-for services were provided by independent contractors; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by unsupervised PAs, in violation of material licensing laws.

529.    Ahmed and Town Medical intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Town Medical that were not compensable under the No-Fault Laws.

530.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $188,000.00 pursuant to the fraudulent bills submitted by Defendants through Town Medical.

531.    Ahmed and Town Medical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

532.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-FIFTH CAUSE OF ACTION
### Against Ahmed, Gelb, and Town Medical
### (Unjust Enrichment)

533.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

534.    As set forth above, Ahmed, Gelb, and Town Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

535.    When GEICO paid the bills and charges submitted by or on behalf of Town Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

536.    Ahmed, Gelb, and Town Medical have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Ahmed, Gelb, and Town Medical voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

537.    Ahmed, Gelb, and Town Medical's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

538.    By reason of the above, Ahmed, Gelb, and Town Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than $188,000.00.

### TWENTY-SIXTH CAUSE OF ACTION
**Against Gelb and John Doe Defendants**
**(Aiding and Abetting Fraud)**

539.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

540.    Gelb and John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Ahmed and Town Medical.

541.    The acts of Gelb in furtherance of the fraudulent scheme included, among other things, agreeing to serve as nominal owner of Town Medical when she knew was not receiving any beneficial ownership or control, allowing her name and medical license to be listed on Town Medical's billing as owner, and allowing her name to be listed on Town Medical's billing as the treating provider even though she rarely, if ever, rendered any of the Fraudulent Services billed through Town Medical.

542.    The acts of John Doe Defendants in furtherance of the fraudulent scheme included, among other things, assisting with the operation of Town Medical, knowingly referring Insureds to Town Medical in exchange for illegal kickbacks from Ahmed, and Town Medical and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

543.    The conduct of Gelb and John Doe Defendants in furtherance of the fraudulent scheme was significant and material. The conduct of Gelb was a necessary part of and was critical to the success of the fraudulent scheme because her actions allowed Ahmed to conceal the nature and extent of Town Medical's association with the fraudulent scheme and, thus, allowed Town

Medical to receive more payments from GEICO, and likely other no-fault insurance carriers, than it would have had its association with Ahmed been readily identifiable. Likewise, the conduct of John Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Ahmed or Town Medical to obtain referrals of patients at the Clinics, subject those patients to medically unnecessary services, and obtain payment from GEICO and other insurers for the Fraudulent Services.

544.    Gelb and John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Ahmed and Town Medical for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

545.    The conduct of Gelb and the John Doe Defendants caused GEICO to pay more than $188,000.00 pursuant to the fraudulent bills submitted through Town Medical.

546.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

547.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-SEVENTH CAUSE OF ACTION
### Against Ahmed
### (Violation of RICO, 18 U.S.C. § 1962(c))

548.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

549.    Atlantic Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

550.     Ahmed knowingly has conducted and/or participated, directly or indirectly, in the conduct of Atlantic Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Atlantic Medical was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Atlantic Medical obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Atlantic Medical's employees.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "6."

551.     Atlantic Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Ahmed operated Atlantic Medical, inasmuch as Atlantic Medical never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Atlantic Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Atlantic Medical to the present day.

552.     Atlantic Medical is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Atlantic Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

553.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $269,000.00 pursuant to the fraudulent bills submitted by the Defendants through Atlantic Medical.

554.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## TWENTY-EIGHTH CAUSE OF ACTION
### Against Ahmed and John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

555.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

556.     Atlantic Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

557.     Ahmed and John Doe Defendants are employed by and/or associated with the DEO enterprise.

558.     Ahmed and John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Atlantic Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking

payments that Atlantic Medical was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Atlantic Medical obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Atlantic Medical's employees. The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "6."

559.     Ahmed and John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

560.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $269,000.00 pursuant to the fraudulent bills submitted by Defendants through Atlantic Medical.

561.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and

proper.

### TWENTY-NINTH CAUSE OF ACTION
**Against Ahmed and Atlantic Medical**
**(Common Law Fraud)**

562.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

563.    Ahmed and Atlantic Medical intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

564.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Atlantic Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Atlantic Medical and Ahmed; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of Atlantic Medical, when in fact many of the billed-for services were provided by independent contractors.

565.    Ahmed and Atlantic Medical intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Atlantic Medical that were not compensable under the No-Fault Laws.

566.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $269,000.00 pursuant to the fraudulent bills submitted by Defendants through Atlantic Medical.

567.    Ahmed and Atlantic Medical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

568.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTIETH CAUSE OF ACTION
### Against Ahmed and Atlantic Medical
### (Unjust Enrichment)

569.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

570.    As set forth above, Ahmed and Atlantic Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

571.    When GEICO paid the bills and charges submitted by or on behalf of Atlantic Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

572.    Ahmed and Atlantic Medical have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

573.    Ahmed and Atlantic Medical's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

574.    By reason of the above, Ahmed and Atlantic Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than $269,000.00.

## THIRTY-FIRST CAUSE OF ACTION
### Against John Doe Defendants
### (Aiding and Abetting Fraud)

575.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

576.    John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Ahmed and Atlantic Medical.

577.    The acts of John Doe Defendants in furtherance of the fraudulent scheme included, among other things, assisting with the operation of Atlantic Medical, knowingly referring Insureds to Atlantic Medical in exchange for illegal kickbacks from Ahmed and Atlantic Medical, and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

578.    The conduct of John Doe Defendants in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Ahmed or Atlantic Medical to obtain referrals of patients at the Clinics, subject those patients to medically unnecessary services, and obtain payment from GEICO and other insurers for the Fraudulent Services.

579.    John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Ahmed and Atlantic Medical for medically unnecessary,

illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

580.    The conduct of John Doe Defendants caused GEICO to pay more than $269,000.00 pursuant to the fraudulent bills submitted through Atlantic Medical.

581.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

582.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## **JURY DEMAND**

583.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against all Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Ahmed, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $200,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Ahmed and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of

$200,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Ahmed and ENS Medical, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $200,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

E.    On the Fifth Cause of Action against Ahmed and ENS Medical, more than $200,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.    On the Sixth Cause of Action against John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $200,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

G.    On the Seventh Cause of Action against Ahmed, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $742,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.    On the Eighth Cause of Action against Ahmed and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $742,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.    On the Ninth Cause of Action against Ahmed and Queens Medical, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $742,000.00,

together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Ahmed and Queens Medical, more than $742,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

K.      On the Eleventh Cause of Action against John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $742,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

L.      On the Twelfth Cause of Action against Ahmed, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $751,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M.      On the Thirteenth Cause of Action against Ahmed and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $751,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.      On the Fourteenth Cause of Action against Ahmed and ECMC, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $751,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against Ahmed and ECMC, more than $751,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

P.      On the Sixteenth Cause of Action against John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $751,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

Q.      On the Seventeenth Cause of Action against Ahmed, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $141,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

R.      On the Eighteenth Cause of Action against Ahmed and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $141,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.      On the Nineteenth Cause of Action against Ahmed and Garden Medical, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $141,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

T.      On the Twentieth Cause of Action against Ahmed and Garden Medical, more than $141,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

U.      On the Twenty-First Cause of Action against John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $141,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

V.      On the Twenty-Second Cause of Action against Ahmed, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $188,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

W.      On the Twenty-Third Cause of Action against Ahmed, Gelb, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $188,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

X.      On the Twenty-Fourth Cause of Action against Ahmed and Town Medical, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $188,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Y.      On the Twenty-Fifth Cause of Action against Ahmed, Gelb, and Town Medical, more than $188,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

Z.      On the Twenty-Sixth Cause of Action against Gelb and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $188,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

AA.     On the Twenty-Seventh Cause of Action against Ahmed, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $269,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

BB.     On the Twenty-Eighth Cause of Action against Ahmed and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $269,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

CC.     On the Twenty-Ninth Cause of Action against Ahmed and Atlantic Medical, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $269,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

DD.     On the Thirtieth Cause of Action against Ahmed and Atlantic Medical, more than $269,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

EE.     On the Thirty-First Cause of Action against John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $269,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

Dated: March 25, 2022
       Uniondale, New York

                                        RIVKIN RADLER LLP

                                        By:   _/s/  Barry I. Levy_____
                                        Barry I. Levy, Esq.
                                        Michael A. Sirignano, Esq.
                                        Steven Henesy, Esq.
                                        926 RXR Plaza
                                        Uniondale, New York 11556
                                         (516) 357-3000
                                        *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*